# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

BAUSERMAN v UNEMPLOYMENT INSURANCE AGENCY

Docket No. 160813. Argued on application for leave to appeal on October 6, 2021. Decided July 26, 2022.

Grant Bauserman, Karl Williams, and Teddy Broe, on behalf of themselves and all others similarly situated, brought a putative class action in the Court of Claims against the Unemployment Insurance Agency, alleging that defendant had violated their due-process rights in violation of Const 1963, art 1, § 17 and that defendant had also engaged in unlawful collection practices. Plaintiffs, who were all recipients of unemployment compensation benefits, specifically alleged that defendant had used an automated fraud-detection system—the Michigan Integrated Data Automated System (MiDAS)—to determine that plaintiffs had received unemployment benefits for which they were not eligible and then garnished plaintiffs' wages and tax refunds to recover the amount of the alleged overpayments, interest, and penalties that defendant had assessed without providing meaningful notice or an opportunity to be heard. Defendant moved for summary disposition on multiple grounds, including that the claims were not timely filed and that plaintiffs could not pursue a constitutional-tort claim against defendant because plaintiffs had alternative remedies they could pursue under the Michigan Employment Security Act (MESA), MCL 421.1 *et seq*. The Court of Claims, CYNTHIA D. STEPHENS, J., denied defendant's motion, reasoning, in part, that plaintiff's constitutional claims were viable because the administrative remedies were inadequate. Defendant appealed. In an unpublished per curiam opinion issued July 18, 2017 (Docket No. 333181), the Court of Appeals, GADOLA, P.J., and METER and FORT HOOD, JJ., reversed, concluding that plaintiffs' claims were not timely filed. Plaintiffs sought leave to appeal in the Supreme Court, which ordered and heard oral argument on the application. 501 Mich 1047 (2018). In lieu of granting leave to appeal, the Supreme Court held that the actionable harm in a predeprivation due-process claim occurs when a plaintiff has been deprived of property and that such a claim accrues when a plaintiff has first incurred the deprivation. As a result, Bauserman and Broe had timely filed their claims within six months following the deprivation of their property, but Williams had not. The Supreme Court thus affirmed in part and reversed in part the Court of Appeals judgment and remanded the case to the Court of Appeals for consideration of defendant's argument that plaintiffs failed to raise cognizable constitutional-tort claims. 503 Mich 169 (2019). On remand, in a published opinion issued December 5, 2019, the Court of Appeals, METER and FORT HOOD, JJ. (GADOLA, P.J., concurring), concluded that the alleged violations arose from actions taken by state actors pursuant to a governmental policy and that they could be characterized as an established practice of state government officials such that they amounted to a

custom supported by the force of law. 330 Mich App 545 (2019). In concluding that damages were available as a remedy for the due-process deprivation plaintiffs alleged, the Court of Appeals applied the multifactor balancing test set forth by Justice BOYLE in her opinion in *Smith v Dep't of Pub Health*, 428 Mich 540 (1987) (BOYLE, J., concurring in part and dissenting in part). Defendant sought leave to appeal. The Supreme Court ordered and heard oral argument on whether to grant defendant's application for leave to appeal or take other action. 506 Mich 965 (2020).

In an opinion by Justice CAVANAGH, joined by Chief Justice MCCORMACK and Justices BERNSTEIN, and WELCH, the Supreme Court, in lieu of granting leave to appeal, *held*:

A constitutional-tort action for monetary damages against the state exists except in two specific circumstances: (1) when the Constitution has delegated to another branch of government the obligation to enforce the constitutional right at issue or (2) when another branch of government has provided a remedy that the Supreme Court considers adequate. An alternative remedy is adequate when it is at least as protective of a particular constitutional right as a judicially recognized cause of action would be. Justice BOYLE's differing multifactor approach for determining whether a constitutional-tort action could be brought against the state was rejected as was her assertion that the state could not be held vicariously liable. People who have been deprived of a constitutional right may seek redress through the courts, regardless of whether the harm was inflicted pursuant to state custom or policy; in other words, the state can be responsible under a theory of respondeat superior for the actions of its agents whether or not the agents were acting under a state custom or policy at the time of the alleged tort. In this case, neither of the exceptions to the existence of liability for a constitutional tort applied to plaintiffs' claims that defendant violated their due-process rights. Plaintiffs alleged a cognizable constitutional-tort claim for which they could recover money damages. The Court of Claims correctly denied defendant's motion for summary disposition.

1. Although the Court of Appeals has frequently applied the multifactor test set forth in Justice BOYLE's partial concurrence in *Smith*, the Michigan Supreme Court has not previously found consensus on whether violations of the state's Constitution are compensable through actions seeking monetary damages. However, in *Bivens v Six Unknown Named Agents of Fed Bureau of Narcotics*, 403 US 388 (1971), which recognized for the first time a cause of action against federal agents for a violation of federal constitutional rights, the United States Supreme Court made clear that constitutional violations have historically been redressed with monetary damages; other state courts have similarly concluded that they bear the duty of vindicating rights guaranteed in their constitutions. The continued vitality of *Bivens* and how federal constitutional torts differ from state constitutional torts was not relevant to the holding of the Court in this case; the holding did not rely on *Bivens* but on the authorities discussed in that case. Plaintiffs' cause of action was grounded in state constitutional rights and the Michigan Supreme Court's authority and duty to say what the law is.

2. Relevant here, Article 1 of Michigan's Constitution, the Declaration of Rights, is the bedrock upon which everything else in the Constitution was built because it guarantees civil and political integrity and the freedom and independence of the state's citizens. Any right given in the Constitution must have a remedy or it is not a right at all but, instead, a voluntary obligation. The Constitution does not have to explicitly provide for a remedy for a constitutional violation in order for the Court to enforce its guarantees, regardless of whether the appropriate remedy is in the form

of an injunction or money damages; indeed, only a handful of the 27 sections of the Declaration of Rights mention remedies at all.

3. While the Constitution vests the legislative power of the state in the Senate and House of Representatives, granting them the right to make laws and to alter or repeal them, it exclusively vests the judicial power of the state in the Court, which retains all judicial power not ceded to the federal government. The Separation of Powers Clause of Michigan's Constitution requires courts to recognize and redress constitutional violations; in that regard, the Michigan Supreme Court has primary responsibility for interpreting and enforcing the Constitution absent an explicit constitutional provision limiting its authority to redress constitutional violations. Stated differently, vindication of constitutional rights is not dependent on legislative action unless the Constitution specifically delegates that power to the Legislature. The scope of the Legislature's authority to regulate tort liability created by statute has no bearing on whether the Legislature has authority to restrict rights codified in the Constitution, let alone whether those rights remain undeveloped without legislative enactment. Further, Legislative silence on the issue of remedies for a due-process violation under Const 1963, art 1, § 17 does not signal the ratifiers' intent to preclude any mechanism of enforcement. However, while the Legislature may not trump the Constitution, it may enact a remedial scheme to provide a way in which to vindicate a constitutional right equal to that which the Court could afford. Thus, if the Legislature already provides an adequate mechanism to remedy a constitutional tort—i.e., one that is at least as protective of a particular constitutional right as a judicially recognized cause of action would be— the Court is not required to duplicate the effort. Absent those considerations, the Court retains authority to vindicate the rights guaranteed by the state's Constitution, including by recognizing actions seeking money damages. Accordingly, money damages are an available remedy for constitutional torts unless (1) enforcement of the constitutional right was delegated to another branch of government by the Constitution or (2) the Court considers adequate the remedy provided by another branch of government. By adopting this test, the Court rejected Justice BOYLE's multifactor approach in *Smith*. The Court's inherent judicial authority requires the Court to afford a remedy for *all* constitutional violations, not just those it deems wise or justified. Further, unlike Justice BOYLE's test, the standard of liability in a constitutional-damages claim is not limited to a direct standard of liability; people who have been deprived of a constitutional right may seek redress through the courts, regardless of whether their harm was inflicted pursuant to state custom or policy.

4. The Due Process Clause of Michigan's Constitution, which is part of the Declaration of Rights, provides that no person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law. The right of all individuals, firms, corporations, and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed. The language of the Due Process Clause does not confer authority on another branch of government to provide a remedy for a violation of that right; thus, courts may infer a damages remedy under that provision if another branch of government has not provided an adequate remedy.

5. In this case, plaintiffs asserted that defendant's use of MiDAS deprived them of their property without adequate process and an opportunity to be heard. The Due Process Clause did not confer authority on another branch of government to provide a remedy for violation of that right. MESA did not provide a remedy for plaintiffs because they did not challenge the

administration of the act or seek a super appeal from a benefits determination. Instead, plaintiffs brought a tort claim challenging defendant's use of MiDAS to deprive plaintiffs of property without due process of law, and no other adequate remedy existed to vindicate the alleged violation of plaintiffs' rights. Under the facts alleged, plaintiffs' allegations, if proven, were sufficient to sustain a constitutional-tort claim under Michigan's Due Process Clause for which they could recover monetary damages. The Court of Claims correctly denied defendant's motion for summary disposition.

Affirmed; case remanded to the Court of Claims for further proceedings.

Justice WELCH, concurring, agreed with the majority that a party has the ability to sue the state for monetary damages on the basis of an alleged constitutional violation and that the remedy will be implied when the only way to adequately remedy the violation is to allow for monetary damages. She also agreed with the majority's framework for recognizing a constitutional tort for monetary damages and with the holding that plaintiffs pleaded a valid constitutional tort for monetary damages in this case. She wrote separately because she would have gone further than the majority and expressly limited monetary damages for constitutional torts to claims arising from a violation of a right enumerated in Michigan's Declaration of Rights, Const 1963, art 1. The liberties set forth in the Declaration are fundamental and inalienable while the balance of the Constitution focuses on alienable rights and liberties that the people have entrusted to the state to allow for a democratic government to operate. Typically, a violation of those alienable rights would be poorly suited to vindication through a monetary-damages award against the state. For those reasons, Justice WELCH limited her concurrence with Part III of the majority opinion to the extent it could be interpreted as applying beyond a claim under the Declaration of Rights and she did not join footnote 13 of that opinion to the extent it declined to adopt such a limitation. The majority's "adequate-alternative-remedy requirement" substantially limits the state's liability for constitutional-tort claims because those claims are rare given that adequate alternative remedies to an implied monetary-damages remedy exist in most cases. An adequate remedy need not make a plaintiff whole in every circumstance; and the Legislature may manage potential exposure by providing rights and remedies in legislation that are substantial enough to adequately secure and give meaning to the constitutional right. Unless monetary damages are necessary to secure and vindicate a violation of a constitutional right, a policy decision of the Legislature or the Executive Branch regarding how to remedy a violation of legal rights under a statutory scheme should not be second-guessed. The threshold question for judges is whether a remedy is adequate, not whether it is ideal or equally comprehensive. To that end, the question is not just whether monetary damages or other remedies are available by some other means, such as through a state or federal statute or through a cause of action under the common law; the question is also whether the existing remedy—injunctive relief, declaratory relief, more process, a refund, or whatever it is—will be adequate such that the constitutional right is preserved and not rendered ineffectual.

Justice VIVIANO, joined by Justice ZAHRA, dissenting, disagreed with the majority's conclusion that a party has the ability to sue the state for monetary damages on the basis of an alleged constitutional violation. Any reliance on *Bivens* to support the Court's holding was misplaced because the United States Supreme Court has only recognized a *Bivens*-style damages claim on two other occasions and those decisions pose separation-of-powers concerns because the Constitution grants to the Legislature the power to create causes of action, not the judiciary. Under Justice BOYLE's test in *Smith*, courts considered multiple factors when determining whether to

infer a damages remedy for violations of the Constitution caused by a custom or policy. The separation-of-powers criticisms of *Bivens* apply equally to *Smith*. Courts violate the separation of powers when they create causes of action for money damages for constitutional violations; only the Legislature has authority to fashion remedies for constitutional wrongs, not the judiciary. The majority's recognition of monetary damages for a constitutional violation by the states obliterates the protections afforded by the separation of powers. To the extent the majority grounded its decision on the Court's common-law powers, the decision massively expanded constitutional-tort liability. The majority's test provides no guidance in that the Legislature's remedy for a constitutional violation will only be adequate if it is that which the Supreme Court would have come up with itself. In addition, the scope of the holding was uncertain because, while the opinion focuses on a provision in the Declaration of Rights, three justices left open the possibility that implied causes of action for damages could be found outside the Declaration. Nothing in the text or history of Michigan's Constitution supports finding a general cause of action for damages based on constitutional violations; relevant here, the text of the Due Process Clause does not support a damages remedy. By allowing such claims, *Smith* was wrongly decided and the majority here compounded the error by broadening *Smith*. There is a distinction between a court invalidating unconstitutional governmental action by enjoining those violations and a court adopting judicially created doctrines that, in effect, usurp legislative authority by creating de facto statutory enactments to implement a constitutional provision. Thus, recognizing that a person may invoke a court's equitable powers to enjoin constitutional violations is not inconsistent with rejecting the inferring of causes of action for damages from the constitutional text. The majority's textual analysis amounts to the proposition that the very nature of a right implies a remedy, but the United States Supreme Court and this Court have recognized that not all areas of law provide for damages remedies for the violation of rights. The majority's suggestion that there is a historical practice of inferring damages remedies is also not on point because the cases relied on were ordinary tort actions in which the constitutional arguments were incidental to the cause of action and entitlement to damages. Justice VIVIANO would have held that the majority's expansion of *Smith* was wrong and that *Smith* should be overruled, putting an end to the Court's usurpation of the Legislature's authority to create causes of action for damages for constitutional violations. Nonetheless, he noted that had the majority simply applied Justice BOYLE's test, which three justices in the current majority recently noted was "persuasive," a damages remedy could not properly have been inferred given the facts in this case.

Justice CLEMENT, dissenting, disagreed with the majority's reconsideration and replacement of the test set forth in Justice BOYLE's partial concurrence in *Smith* because that action was not requested by plaintiffs. For the reasons stated in Part IV of Justice VIVIANO's dissent, Justice CLEMENT would have applied the *Smith* test to conclude that a damages remedy should not be inferred in this case.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 26, 2022

STATE OF MICHIGAN

SUPREME COURT

GRANT BAUSERMAN, KARL
WILLIAMS, and TEDDY BROE, on Behalf
of Themselves and All Others Similarly
Situated,

      Plaintiffs-Appellees,

v                                   No. 160813

UNEMPLOYMENT INSURANCE
AGENCY,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

In this case, we are presented with the question of whether plaintiffs have alleged a cognizable state constitutional-tort claim allowing them to recover a judicially inferred damages remedy. Plaintiffs allege that defendant, Michigan's Unemployment Insurance Agency (the Agency), adjudicated allegations of fraud, seized plaintiffs' tax returns, and

imposed penalties on plaintiffs without providing meaningful notice or an opportunity to be heard in violation of Michigan's constitutional right to due process, Const 1963, art 1, § 17. Among other remedies for this constitutional violation, plaintiffs seek monetary damages. Although we have never specifically held that monetary damages are available to remedy constitutional torts, we now hold that they are. Inherent in the judiciary's power is the ability to recognize remedies, including monetary damages, to compensate those aggrieved by the state, whether pursuant to an official policy or not, for violating the Michigan Constitution unless the Constitution has specifically delegated enforcement of the constitutional right at issue to the Legislature or the Legislature has enacted an adequate remedy for the constitutional violation. Because enforcement of Const 1963, art 1, § 17 has not been delegated to the Legislature and because no other adequate remedy exists to redress the alleged violations of plaintiffs' rights, we agree that plaintiffs have alleged a cognizable constitutional-tort claim for which they may recover money damages and we agree with the lower courts that defendant was properly denied summary disposition.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs Grant Bauserman and Teddy Broe are former recipients of unemployment compensation benefits who allege that the Agency unlawfully seized their property through use of the Michigan Data Automated System (MiDAS) without affording them due process of law. Their complaint alleges that MiDAS initiates an automated process that can result in recipients being disqualified from benefits and subjected to penalties and criminal prosecution, all without notice or an opportunity to be heard.

2

Grant Bauserman separated from employment with Eaton Aeroquip and then collected unemployment benefits from September 2013 to March 2014. On December 3, 2014, the Agency issued two notices of redetermination—one claiming that Mr. Bauserman had received unemployment benefits for which he was ineligible and another claiming that he had intentionally misled the Agency or concealed information from it. The Agency assessed penalties and interest and informed Mr. Bauserman that he owed $19,910. He timely protested the redetermination through an online appeal on the Agency's website, and that protest was forwarded to the Michigan Administrative Hearing System (MAHS) for a hearing. However, MAHS sent the matter back to the Agency, and on June 16, 2015, the Agency intercepted Mr. Bauserman's tax refund. Eventually, the Agency reviewed the information Mr. Bauserman submitted and concluded that its adjudication of fraud was incorrect—Mr. Bauserman was eligible for the unemployment benefits he had received, and he neither misled the Agency nor concealed information from it. On September 30, 2015, the Agency issued another redetermination, this one finding that the December 3, 2014 redeterminations were "null and void." The Agency subsequently returned all monies that it had improperly seized from Mr. Bauserman.

Teddy Broe collected benefits in 2013, and the Agency issued a redetermination on July 15, 2014, finding Mr. Broe ineligible for benefits and assessing penalties. Mr. Broe did not initially protest, and the Agency assessed penalties and interest totaling more than $8,000. In April 2015, Mr. Broe wrote to the Agency, appealing the redetermination and explaining that he had not received the Agency's earlier communications because they were sent to his online account with the Agency and he was no longer accessing that account because he was no longer receiving benefits. The Agency intercepted his tax

3

refunds in May 2015. The Agency initially denied the appeal as untimely but later reconsidered Mr. Broe's case. On November 4, 2015, the Agency issued a new redetermination in Mr. Broe's favor and subsequently returned all monies that had been improperly seized from Mr. Broe.

Mr. Bauserman filed a putative class action against the Agency on September 9, 2015, and he later amended the complaint to add Mr. Broe as a named plaintiff.[1] The complaint alleged that "Michigan's Unemployment fraud detection, collection, and seizure practices fail to comply with minimum due process requirements." (Emphasis omitted.) Mr. Bauserman cited 26 USC 6402(f)(3) (authorizing a state to collect unemployment compensation debts resulting from fraud from federal tax overpayments) and its several requirements, including notice, 60 days to present evidence, and consideration of presented evidence. In addition, Mr. Bauserman cited adjudication standards found in MCL 421.32a, including notice, a reasonable time to supply information to the Agency, 30 days to claim a hearing before an Administrative Law Judge, and a notice of appeal rights.

As stated by the Court of Appeals, plaintiffs alleged that "the Agency systemically, and by way of concerted and coordinated actions, unlawfully intercepted their state and federal tax refunds, garnished their wages, and forced them to repay unemployment benefits that they had lawfully received." *Bauserman v Unemployment Ins Agency (On Remand)*, 330 Mich App 545, 565; 950 NW2d 446 (2019). Additionally, they alleged,

---

[1] The amended complaint also added Karl Williams as a named plaintiff, but because Mr. Williams failed to comply with MCL 600.6431(3) (notice of claim), his claim was dismissed by this Court in a subsequent appeal discussed later in this opinion. *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 193; 931 NW2d 539 (2019).

4

among other things, that MiDAS does not allow 60 days to present evidence and does not allow the Agency to consider presented evidence. Plaintiffs also alleged that the questionnaires sent by the Agency do not provide the basis for the Agency's suspicions or grounds for disqualification. Further, as a practical matter, many claimants never receive the questionnaires because they are sent only to the claimant's electronic account with the Agency, without any additional notice via United States mail or e-mail. Among the alleged harms asserted by plaintiffs were that the Agency "failed to repay to Class Members or to repay on a timely basis funds which were seized by the UIA or paid over to UIA by the Class Member to satisfy overpayments and penalty determinations which were reversed at a later time." Finally, plaintiffs alleged they were deprived of their property without due process of law in violation of Const 1963, art 1, § 17. The Agency moved for summary disposition on a number of grounds. Among them were that plaintiffs failed to state a constitutional-tort claim because other remedies existed. The Court of Claims denied the Agency's motion on that ground. Prior appellate litigation centered on whether plaintiffs' claims accrued when the initial redeterminations were issued or when the Agency seized plaintiffs' tax refunds. We held that "the 'actionable harm' in a predeprivation due-process claim occurs when a plaintiff has been deprived of property, and therefore such a claim 'accrues' when a plaintiff has first incurred the deprivation of property." *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 186; 931 NW2d 539 (2019). We then remanded the case to the Court of Appeals to "consider the Agency's argument that it is entitled to summary disposition on the ground that plaintiffs failed to raise cognizable constitutional tort claims." *Id*. at 193 n 20.

5

On remand, the Court of Appeals started its analysis by reasoning that claims of this sort "originated" in *Bivens v Six Unknown Named Agents of Fed Bureau of Narcotics*, 403 US 388; 91 S Ct 1999; 29 L Ed 2d 619 (1971). *Bauserman (On Remand)*, 330 Mich App at 560. The Court of Appeals noted that in *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW 2d 749 (1987), our Court held that " '[a] claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases,' " but that we did not provide any further guidance on when that claim for damages is available. *Bauserman (On Remand)*, 330 Mich App at 560.

The Court of Appeals followed its general practice with state constitutional torts by first asking whether " 'an official policy or custom caused a person to be deprived of [state] constitutional rights,' " *id*. at 561 (alteration in original), quoting *Carlton v Dep't of Corrections*, 215 Mich App 490, 505; 546 NW2d 671 (1996), and it then looked to Justice BOYLE's partial concurrence in *Smith* to determine whether damages were available, *Bauserman (On Remand)*, 330 Mich App at 561-562, citing *Smith*, 428 Mich at 648-652 (BOYLE, J., concurring in part and dissenting in part). The Court of Appeals concluded that the alleged violations arose from actions taken by state actors pursuant to a government policy and that they could be "aptly characterized as an established practice of state government officials such that [they] amount[] to a custom supported by the force of law." *Bauserman (On Remand)*, 330 Mich App at 566. Weighing the factors offered by Justice BOYLE's partial concurrence, the Court of Appeals concluded that damages were available as a remedy for the due-process deprivations plaintiffs alleged. *Id*. at 576.

Defendant sought leave to appeal in this Court, and we scheduled oral argument on the application, instructing the parties to address "whether the appellees have alleged

6

cognizable constitutional tort claims allowing them to recover a judicially inferred damages remedy." *Bauserman v Unemployment Ins Agency*, 506 Mich 965 (2020).

## II. STANDARDS OF REVIEW

The decision before us for review is whether plaintiffs have failed to state a claim under MCR 2.116(C)(8). "A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). For purposes of this review, we accept all factual allegations in the complaint as true. *Id*. at 160. We review de novo a trial court's decisions on motions for summary disposition. *Id*. at 159. We also review de novo questions of constitutional law. *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 333; 901 NW2d 566 (2017).

## III. ANALYSIS

The recognition and redress of constitutional violations are quintessentially judicial functions, required of us by the Separation of Powers Clause. See Const 1963, art 3, § 2. Our Court maintains primacy in interpreting the Constitution. However, when the Constitution vests the Legislature with this authority and responsibility, our authority is proportionately lessened. Further, while the Legislature cannot trump the Constitution itself, the Legislature may implement a remedial scheme that provides a means of vindicating the constitutional right at a level equal to a remedy this Court could afford. In those circumstances, we would be unlikely to duplicate the Legislature's efforts. But absent either of those conditions, this Court retains the authority—indeed the duty—to vindicate the rights guaranteed by our Constitution. That includes recognizing causes of

7

action seeking money damages. Therefore, money damages are an available remedy for constitutional torts unless (1) the Constitution has delegated to another branch of government the obligation to enforce the constitutional right at issue, see *Lewis v State*, 464 Mich 781, 787; 629 NW2d 868 (2001) (stating that a cause of action for damages cannot be implied by the Constitution when the text of the Constitution instead vests authority in the Legislature to determine the remedies available), or (2) another branch of government has provided a remedy that we consider adequate, see *Mays v Governor*, 506 Mich 157, 197-198; 954 NW2d 139 (2020) (plurality opinion by BERNSTEIN, J.) (concluding that there was no sufficient alternative remedy—except by bringing a constitutional-tort claim—to recover money damages for the plaintiffs' claim of injury to bodily integrity).

## A. *SMITH* AND *MAYS*

Though the question of whether violations of our Constitution are compensable through actions seeking monetary damages has been posed to us before, we have not previously found consensus. In *Smith* we produced several opinions, but our holdings were limited. Ultimately, four Justices agreed that governmental immunity was not a defense to allegations of constitutional torts and that damages may be recognized in appropriate cases. *Smith*, 428 Mich at 544.

In a concurring opinion, Justice BRICKLEY, joined by Justice RILEY, cataloged the ebb and flow of the United States Supreme Court's decisions regarding federal constitutional torts, starting with *Bivens*. *Id*. at 612-626 (BRICKLEY, J., concurring). He then opined that he would have declined to recognize a remedy for the plaintiffs in the

8

*Smith* cases. *Id*. at 626-636. One plaintiff, Jack Smith, who had been confined in a state psychiatric hospital for nearly 50 years, sought relief under 1908 Const, art 2, §§ 1 and 16 for the confinement. *Id*. at 551-552. The other plaintiff, Ray Will, was an employee of the state of Michigan who was denied promotion. *Id*. at 546-550. He sought relief under Const 1963, art 11, § 5 and art 1, §§ 2 and 17. *Id*. Justice BRICKLEY would have denied relief to plaintiff Smith, in part, because the Constitution he relied on was no longer in effect, and so plaintiff Smith was asking for a novel remedy only available to him. *Id*. at 626-632. Justice BRICKLEY also saw plaintiff Smith's argument as grounded in *Bivens* itself, and he found several ways to distinguish plaintiff Smith's facts from those in *Bivens*. *Id*. Plaintiff Will did not rely on *Bivens* but on the existence of a " 'cumulative judicial remedy.' " *Id*. at 633-636 (citations omitted). Justice BRICKLEY did not address this argument because he considered it to be unpreserved. *Id*.

Also concurring, Justice BOYLE, joined by Justice M. CAVANAGH, agreed that plaintiff Will's argument was unpreserved. *Id*. at 637 (BOYLE, J., concurring in part and dissenting in part). But she would have remanded plaintiff Smith's case, writing separately to emphasize that allegations of state constitutional torts avoid governmental immunity. *Id*. at 637-638. She opined, "It is so basic as to require no citation that the constitution is the fundamental law to which all other laws must conform." *Id*. at 640. With regard to statutory governmental immunity, she noted that all statutes should be construed to avoid constitutional invalidity. *Id*. at 641. Given that understanding, she concluded, "The idea that our Legislature would indirectly seek to 'approve' acts by the state which violate the state constitution by cloaking such behavior with statutory immunity is too far-fetched to infer" from the statute. *Id*. Considering common-law sovereign immunity, she noted the

9

concept had been abrogated in *Pittman v City of Taylor*, 398 Mich 41; 247 NW2d 512 (1976), but even absent the abrogation, "[t]he primacy of the state constitution would perforce eclipse the vitality of a claim of common-law sovereign immunity in a state court action for damages." *Smith*, 428 Mich at 641-642 (BOYLE, J., concurring in part and dissenting in part). Relying on "public policy concerns," she would have limited liability to instances in which the action of the state's agent was implementing a policy or custom. *Id*. at 642-644. She also thought the remedy of damages was generally available. *Id*. at 644-648. However, she thought whether to afford a remedy in any particular case might turn on several factors: "(1) the existence and clarity of the constitutional violation itself; (2) the degree of specificity of the constitutional protection; (3) support for the propriety of a judicially inferred damages remedy in any text, history, and previous interpretations of the specific provision; (4) the availability of another remedy; and (5) various other factors militating for or against a judicially inferred damages remedy." *Mays*, 506 Mich at 196 (plurality opinion by BERNSTEIN, J.), citing *Smith*, 428 Mich at 648-652 (BOYLE, J. concurring in part and dissenting in part).

Justice ARCHER, joined by Justice LEVIN, started his analysis by reasoning that any intentional tort, whether constitutional in nature or not, is not barred by governmental immunity. *Smith*, 428 Mich at 657 (ARCHER, J., dissenting). He would not have limited the scope of cognizable constitutional torts to those occurring by virtue of governmental custom or policy. *Id*. at 658.

After *Smith*, the Court of Appeals repeatedly cited that fractured opinion for the proposition that immunity is not available to the state for violating rights guaranteed by the Michigan Constitution. See *Mays*, 506 Mich at 190-191 (plurality opinion by BERNSTEIN,

10

J.) (collecting cases). We did not return to the question of what remedies are available for constitutional torts until *Mays*, when we evenly split over whether to recognize a damages remedy for the alleged constitutional violations there. See *Mays*, 506 Mich 157. Though the Court of Appeals has frequently cited Justice BOYLE's partial concurrence in *Smith*, we could not reach a consensus on what analysis should be controlling. See *Mays*, 506 Mich at 217 (MCCORMACK, C.J., concurring) ("If and when the appropriate time (and case) comes along, we can debate whether *Smith* was correctly decided and what rationale we would use to justify the conclusion that monetary damages are available (or not) in constitutional-tort actions."); *Mays*, 506 Mich at 263 (VIVIANO, J., concurring in part and dissenting in part) ("I question whether *Smith* was correctly decided on this point, and I would be willing to reconsider *Smith* in an appropriate future case.). Now, we face the question once again.

## B. CITIZENS RELY ON COURTS TO PROTECT AND VINDICATE CONSTITUTIONAL RIGHTS

Article 1 of our Constitution is titled "Declaration of Rights." Because it "guarantees the civil and political integrity [and] the freedom and independence of our citizens," the Declaration of Rights "is the bedrock upon which all else in the constitution may be built." 1 Official Record, Constitutional Convention 1961, p 106 (remarks of Governor John B. Swainson). In crafting our current Constitution, the Declaration of Rights was moved into the first article because it is so fundamental to representative government that it "sets up the basic legal guideposts for [its] implementation and enforcement . . . ." 1 Official Record, Constitutional Convention 1961, p 466.

11

One way to think of a right is in terms of the correlative duty it imposes on another to act or refrain from acting for the benefit of the right-holder. See Hohfeld, *Fundamental Legal Conceptions* (New Haven: Yale University Press, 1919), pp 35-38. Thought of in this way, a right must have a remedy. If not, it is not a right at all but only "a voluntary obligation that a person can fulfill or not at his whim," or merely "a hope or a wish." Zeigler, *Rights Require Remedies: A New Approach to the Enforcement of Rights in the Federal Courts*, 38 Hastings L J 665, 678 (1987). This understanding of rights is as old as our republic:

> It is essential to the idea of a law, that it be attended with a sanction; or, in other words, a penalty or punishment for disobedience. If there be no penalty annexed to disobedience, the resolutions or commands which pretend to be laws will in fact amount to nothing more than advice or recommendation. [The Federalist No. 15 (Hamilton) (Cooke ed, 1961), p 95.][2]

Said another way, "[l]egal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." *The Western Maid*, 257 US 419, 433; 42

---

[2] Or, even older:

> Under the common law of England, where individual rights . . . were preserved by a fundamental document (*e.g.*, the Magna Carta), a violation of those rights generally could be remedied by a traditional action for damages. The violation of the constitutional right was viewed as a trespass, giving rise to a trespass action. [*Widgeon v Eastern Shore Hosp Ctr*, 300 Md 520, 525-527; 479 A2d 921 (1984), discussing *Wilkes v Wood*, 98 Eng Rep 489; Lofft's 1 (1763), *Huckle v Money*, 95 Eng Rep 768; 2 Wils 205 (1763), and *Entick v Carrington*, 19 How St Tr 1029 (1765).]

See also *Moresi v Louisiana*, 567 So 2d 1081, 1092 (La, 1990); Wurman, *Qualified Immunity and Statutory Construction*, 37 Seattle U Law Rev 939, 987 (2014) ("[T]he common law expected officers to be mulcted in damages for their errors in judgment. Some courts explicitly stated that the law expected that officers would be grievously punished for such errors.").

S Ct 159; 66 L Ed 299 (1922).  If our Constitution is to function, then the fundamental rights it guarantees must be enforceable.  Our basic rights cannot be mere ethereal hopes if they are to serve as the bedrock of our government.

This Court has not only the authority, but also the primary responsibility of interpreting and enforcing our Constitution.  " 'To adjudicate upon and protect the rights and interests of individual citizens, and to that end to construe and apply the laws, is the peculiar province of the judicial department.' " *Johnson v Kramer Bros Freight Lines, Inc*, 357 Mich 254, 258; 98 NW2d 586 (1959), quoting Cooley, Constitutional Limitations (7th ed), p 132.  The judiciary "has the legitimate authority, in the exercise of the well-established duty of judicial review, to evaluate governmental action to determine if it is consistent with" the Constitution.  *Sharp v Lansing*, 464 Mich 792, 802; 629 NW2d 873 (2001).  This is a first principle, inherent in our tripartite separation of powers.  A "major function[]" of the judiciary is to "guarantee[]" the rights promised in our Constitution.  2 Official Record, Constitutional Convention 1961, p 2196.  If the rights guaranteed in our Constitution are to be more than words on paper, then they must be enforceable.[3]  And if

---

[3] Justice VIVIANO quotes at length from *People ex rel Sutherland v Governor*, 29 Mich 320 (1874), for the proposition that " 'there are a great many' " cases involving rights without a remedy.  There, we noted that, at times, a jury might reach a wrong verdict, or a judge might make an error, or the Legislature could seat someone who was not duly elected, or the Governor might refuse to pardon someone who had conclusively demonstrated that they were wrongfully convicted.  *Id*. at 330.  The fact that there may be nonjusticiable questions courts cannot decide and that the judicial process will, at times, reach incorrect results does not imply that courts are without authority to enforce the Constitution, and *Sutherland* said nothing of the kind.

the rights guaranteed in our Constitution are to be enforceable, then enforcement must fall to us, absent an explicit constitutional provision limiting our authority in this regard.

We agree with the *Smith* majority in this regard: "A claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases." *Smith*, at 428 Mich at 544. And in doing so, both then in *Smith* and here today, we are not an outlier. State courts recognizing private causes of action for state constitutional violations is nothing new. See *Bull v Armstrong*, 254 Ala 390; 48 So 2d 467 (1950) (recognizing a private cause of action for an illegal warrantless search in violation of Alabama's constitution); *Mayes v Till*, 266 So 2d 578 (Miss, 1972) (recognizing a private cause of action for an illegal warrantless search in violation of Mississippi's constitution). By the time the United States Supreme Court announced its decision in *Bivens*, the foundation for state courts to recognize private causes of action for constitutional violations was already ingrained in the American conception of government. See *Widgeon*, 300 Md at 535 ("[T]here is no need to imply a new right of action because, under the common law, there already exists an action for damages to remedy violations of constitutional rights.").

*Bivens* was somewhat novel in that it recognized—for the first time—a cause of action against federal agents for violation of federal constitutional rights. But the Court was clear that the path it traveled had always been open, explicitly stating that courts had always had the authority to remedy violations of constitutional harms: "[I]t has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bivens*, 403 US at 392 (quotation marks and citation omitted). The *Bivens* Court did not think it was doing anything revolutionary but, rather, said the notion

14

that constitutional violations could be redressed with monetary compensation "should hardly seem a surprising proposition." *Id*. at 395.

Since *Bivens*, sister courts in other states have likewise concluded that they bear the duty of vindicating the rights guaranteed in their constitutions. "It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State." *Corum v Univ of North Carolina*, 330 NC 761, 783; 413 SE2d 276(1992). "It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens." *Godfrey v Iowa*, 898 NW2d 844, 865 (Iowa, 2017). "The power of the Court to enforce rights recognized by the New Jersey Constitution, even in the complete absence of implementing legislation, is clear." *King v S Jersey Nat'l Bank*, 66 NJ 161, 177; 330 A2d 1 (1974), citing *Marbury v Madison*, 5 US (1 Cranch) 137, 163; 2 L Ed 60 (1803). See also *Gay Law Students Ass'n v Pacific Tel & Tel Co*, 24 Cal 3d 458, 475; 595 P2d 592; 156 Cal Rptr 14 (1979) (recognizing a cause of action for monetary damages for a violation of the state's Equal Protection Clause); *Newell v Elgin*, 34 Ill App 3d 719, 722-725; 340 NE2d 344 (1976) (recognizing a cause of action for monetary damages for a violation of the state's illegal-seizure protection); *Moresi v Louisiana*, 567 So 2d 1081; 1091-1093 (La, 1990) (recognizing a cause of action for monetary damages for a violation of the state's privacy protection); *Widgeon*, 300 Md at 525-534 (recognizing a cause of action for monetary damages for a violation of the state's search-and-seizure protection). But see *Godfrey*, 898 NW2d at 856-857 (collecting cases and describing courts as "nearly equally divided").

These courts frequently refer to principles relied on by the *Bivens* Court and to 4 Restatement Torts, 2d, § 874A, comment *a*, p 301.[4]

The *Bivens* Court explained how constitutional torts hold the potential for greater harm than private torts: "An agent acting—albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." *Bivens*, 403 US at 392. Other courts have continued to make similar observations: "[T]here is a great distinction between wrongs committed by one private individual against another and wrongs committed under authority of the state." *Dorwart v Caraway*, 312 Mont 1, 16; 2002 MT 240; 58 P3d 128 (2002). The purpose of codifications of rights in the federal Constitution, our Constitution, and the constitutions of other states is to protect against these unique and dangerous encroachments. *Corum*, 330 NC at 782-783; see also *Godfrey*, 898 NW2d at 876-877; *Binette*, 244 Conn at 43. That danger is exemplified here. Plaintiffs allege that when they were rightfully eligible for unemployment benefits—meant to be a hand up during a financially difficult and fragile juncture—they were accused of fraud and assessed staggering penalties without notice or any meaningful opportunity to be heard.[5]

---

[4] 4 Restatement, p 301 states: "When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action." Comment *a* specifies that this notion includes constitutional provisions.

[5] It has been estimated that, between 2013 and 2015, approximately 40,000 people in Michigan were wrongfully accused of unemployment fraud as a result of the lack of due

To remedy these types of harms, the *Bivens* Court saw nothing extraordinary about the availability of monetary damages: "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens*, 403 US at 395, citing *Nixon v Condon*, 286 US 73; 52 S Ct 484; 76 L Ed 984 (1932); *Nixon v Herndon*, 273 US 536, 540; 47 S Ct 446; 71 L Ed 759 (1927); *Swafford v Templeton*, 185 US 487; 22 S Ct 783; 46 L Ed 1005 (1902); *Wiley v Sinkler*, 179 US 58; 21 S Ct 17; 45 L Ed 84 (1900); Landynski, *Search and Seizure and the Supreme Court*, pp 28 *et seq*. (1966); Lasson, *History and Development of the Fourth Amendment to the United States Constitution*, pp 43 *et seq*. (1937); Katz, *The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in* Bell v Hood, 117 U Pa L Rev 1, 8-33 (1968); cf. *West v Cabell*, 153 US 78; 14 S Ct 752; 38 L Ed 643 (1894); *Lammon v Feusier*, 111 US 17; 4 S Ct 286; 28 L Ed 337 (1884). Rejecting alternate framings, the *Bivens* Court saw the question before it as a simple one—whether the petitioner was "entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." *Bivens*, 403 US at 397. The answer was axiomatic: " 'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he

---

process alleged by plaintiffs. De La Garza*, States' Automated Systems are Trapping Citizens in Bureaucratic Nightmares With Their Lives On the Line*, Time Magazine (May 28, 2020) <https://time.com/5840609/algorithm-unemployment/> (accessed March 4, 2022) [https://perma.cc/9THC-9HL3]. In addition, a study conducted by the Agency concluded that, during this same period, approximately 93% of the automated system's fraud determinations were incorrect. Felton, *Michigan Unemployment Agency Made 20,000 False Fraud Allegations – Report*, The Guardian (December 18, 2016) <https://www.theguardian.com/us-news/2016/dec/18/michigan-unemployment-agency-fraud-accusations> (accessed March 4, 2022) [https://perma.cc/4LEH-8KAZ].

receives an injury.' " *Id*., quoting *Marbury*, 5 US (1 Cranch) at 163.  Other courts have shared that view.  "The availability of damages at law is thus an ordinary remedy for violation of constitutional provisions, not some new-fangled innovation."  *Godfrey*, 898 NW2d at 868.  We share this view and make the unremarkable observation that damages are an available remedy for the state's constitutional violations.  "This Court is ultimately responsible for enforcing our state's Constitution, and remedies are how we do that." *Mays*, 506 Mich at 215 (MCCORMACK, C.J., concurring).

One final point about *Bivens*.  Defendant argues that the United States Supreme Court's recent treatment of *Bivens* requires this Court to refrain from recognizing causes of action for constitutional torts.  We disagree.  This Court has already debated the continued vitality of *Bivens* and how federal constitutional torts differ from state constitutional torts.  See *Mays*, 506 Mich at 214-224 (MCCORMACK, C.J., concurring); *Mays*, 506 Mich at 245-263 (VIVIANO, J., concurring in part and dissenting in part). Whatever the relative merits of those positions, they are beside the point.  Our holding today does not rely on *Bivens* at all, but on the authorities that *Bivens* discussed and that so many other courts have discussed since then.  *Bivens* is famous and often cited, and with good reason.  It is an eloquent explanation of the judiciary's duty to enforce constitutional guarantees and its authority to use available remedies to that end.  But *Bivens* is just that— a discussion of the authority, not the authority itself.  The plaintiffs' cause of action is created by our state Constitution, not by any court.[6]  Our holding today is grounded in the

---

[6] See *Godfrey*, 898 NW2d at 866 ("As a rhetorical device, the defendants suggest that *Bivens* claims for Iowa constitutional violations amount to a 'new cause of action.'  But we

constitutional rights relied on by plaintiffs as well as our authority and duty to say what the law is. See *Marbury*, 5 US (1 Cranch) at 177. These authorities remain undisturbed.

Justice VIVIANO responds only in passing to the core idea that a right requires a remedy. He briefly and puzzlingly acknowledges *Marbury*, but his takeaway is that the Court could not enforce a remedy for William Marbury because it did not have jurisdiction. That is an accurate statement about *Marbury*, and if we similarly lacked jurisdiction in this matter, we would have no authority to enforce a remedy. Of course, we do have jurisdiction here.[7]

Further, Justice VIVIANO'S belief would prove far too much. He believes that constitutional rights can exist without remedies and, if a remedy is to exist, the Constitution must explicitly provide it. But of the 27 sections of the Declaration of Rights, only a handful mention remedies at all.[8] Most of the guarantees of the Declaration of Rights are not enacted in statute, but we enforce them nonetheless through whatever remedy is

_____

face an old problem, not a new problem. The old problem is whether courts have the power to provide an appropriate remedy for constitutional wrongs.").

[7] If Justice VIVIANO means to suggest that *Marbury* is dicta on this point, he is technically correct. Nonetheless, *Marbury*'s recognition of the judiciary's authority to say what the law is has clearly been widely followed.

[8] Const 1963, art 1, § 2 delegates authority for enforcing the right to equal protection of the laws to the Legislature. Const 1963, art 1, § 11 addresses available remedies for a violation of the protection from unreasonable searches and seizures only in that it limits application of the exclusionary rule, though of course it cannot impact the exclusionary rule's enforcement of US Const, Am IV. Const 1963, art 1, § 15 provides a specific remedy in the event a criminal defendant is denied bail and trial has not commenced within 90 days. Const 1963, art 1, § 24 indicates the Legislature may enact its provisions. Const 1963, art 1, § 26 also addresses remedies.

appropriate for a violation. Justice VIVIANO distinguishes causes of action for constitutional torts because the legislative power " 'encompasses the power to create causes of action.' " *Post* at 7, quoting *Mays*, 506 Mich at 259 (VIVIANO, J., concurring in part and dissenting in part). Generally, enforcing constitutional rights through injunctive relief is uncontroversial, see, e.g., *Brown v Bd of Ed of Topeka*, 347 US 483, 486 n 1; 74 S Ct 686; 98 L Ed 873 (1954), and *Brown v Bd of Ed of Topeka*, 349 US 294; 75 S Ct 753; 99 L Ed 1083 (1955), despite the lack of an explicit constitutional authorization for such a cause of action. So the problem is not really that it is a legislative function to "create causes of action"——instead, the problem appears to be that the remedy is in the form of money damages. Justice VIVIANO doesn't offer any specific reason why this remedy requires explicit authorization while others, such as injunctive relief, do not, aside from his belief that "[t]he creation of that liability, dependent upon policy considerations that the judiciary is institutionally ill-suited to address, is a task that falls within the legislative sphere."

We agree with Justice VIVIANO, actually, that judges should not create liability based on policy considerations. We are doing nothing of the kind. The Constitution poses restrictions on the state for the protection of Michigan citizens, and if the state harms its citizens in violation of those prohibitions, that is what creates liability. Justice VIVIANO would err in the opposite direction; he would excuse the state's liability based on his own policy concern—that a violation of constitutional rights should not be redressed by money damages. The core principle that guides our reasoning is that a right must be enforceable; otherwise, it is not right at all but a mere hope. It merits repeating that the fundamental rights our Constitution guarantees are "the bedrock upon which all else in the constitution

20

may be built." 1 Official Record, Constitutional Convention 1961, p 106 (remarks of Governor John B. Swainson). Without them, there is nothing.

## C. LEGISLATIVE SILENCE DOES NOT DIVEST COURTS OF THEIR AUTHORITY OR RESPONSIBILITY

Even against this long history of courts enforcing constitutional protections by providing remedies for constitutional violations, the Agency argues that recognizing a cause of action is beyond our authority and that establishing a mechanism to redress the alleged violations of plaintiffs' rights falls to the Legislature. We disagree.

Under our Constitution, "the judicial power of the State is vested exclusively in one court of justice . . . ."[9] Const 1963, art 6, § 1. Unlike federal courts, which are limited to powers specifically enumerated in the United States Constitution, this Court retains all judicial power not ceded to the federal government. *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 362; 792 NW2d 686 (2010). Similarly, the legislative power of the state is vested in the Senate and House of Representatives—collectively, the Legislature. Const 1963, art 4, § 1. Each branch retains "the whole of such power . . . except as it may be restricted in the same instrument." *Washington-Detroit Theatre Co v Moore*, 249 Mich 673, 680; 229 NW 618 (1930). "The legislative power we understand to be the authority, under the Constitution, to make laws, and to alter and repeal them." Cooley, p 109.

What plaintiffs ask of us is not to make new law under the Constitution but, rather, to enforce the Constitution itself. As the United States Supreme Court has noted, "the

---

[9] This grant is limited only by the Const 1963, art 1, § 6 requirement that this Court's decisions shall be in writing and by Const 1963, art 5, § 2, which addresses the Independent Citizens Redistricting Commission.

judiciary has a particular responsibility to assure the vindication of constitutional interests . . . ." *Bivens*, 403 US at 407 (Harlan, J., concurring). In addressing the argument that vindication of constitutional rights should be left to the legislative branch, one of our sister courts reasoned, "It would be ironic indeed if the enforcement of individual rights and liberties in the Iowa Constitution, designed to ensure that basic rights and liberties were immune from majoritarian impulses, were dependent on legislative action for enforcement." *Godfrey*, 898 NW2d at 865. Similarly, "[t]he very purpose of the Declaration of Rights is to ensure that the violation of these rights is never permitted by anyone who might be invested under the Constitution with the powers of the State." *Corum*, 330 NC at 783.

Relying on *McCahan v Brennan*, 492 Mich 730, 736; 822 NW2d 747 (2012), the Agency argues that the Legislature holds the authority to decide whether the state can be sued, and if so, the extent of any liability. The Agency notes that under Const 1963, art 3, § 2, no person exercising the power of one branch shall exercise the power belonging to another branch. The Agency also criticizes Justice BOYLE's partial concurrence in *Smith* for discussing policy concerns while inferring a damages remedy. The Agency asserts these considerations are better left to the Legislature.

The fatal flaw in these arguments is that they assume their own conclusions. Our Constitution provides for a separation of powers generally, and specifically in Const 1963, art 3, § 2. But that observation does nothing to define the boundaries of the authority of the branches. *McCahan* dealt with the governmental tort liability act (GTLA), MCL 691.1401 *et seq*. The issue there was interpretation of the notice requirement found in the GTLA. *McCahan* and our other cases dealing with the GTLA did not involve

constitutional torts but, instead, dealt with conventional torts. The scope of the Legislature's authority to regulate tort liability created by statute has no bearing on whether the Legislature has authority to restrict rights codified in the Constitution, let alone whether those rights remain fallow without legislative enactment. These authorities discuss the Legislature's authority *within* its purview, but they do not explore the boundaries of that purview.

There are instances in which the Constitution specifically tasks the Legislature with implementing the rights it affords. An example is Const 1963, art 1, § 2, which concludes by stating, "The legislature shall implement this section by appropriate legislation." Therefore, the Constitution delegates the construction of the remedy for violation of Const 1963, art 1, § 2 to the Legislature. We have said as much before:

> On its face, the implementation power of Const 1963, art 1, § 2 is given to the Legislature. Because of this, for this Court to implement Const 1963, art 1, § 2 by allowing, for example, money damages, would be to arrogate this power given expressly to the Legislature to this Court. Under no recognizable theory of disciplined jurisprudence do we have such power. [*Lewis v State*, 464 Mich 781, 787; 629 NW2d 868 (2001).]

But in the absence of such a specific delegation, constitutional rights must still be enforceable. As we have discussed, interpreting the Constitution and determining the scope of the rights it affords is the core of our function as the judicial branch. We know "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 US (1 Cranch) at 177. Interestingly, while criticizing Justice BOYLE on the one hand for considering public policy in her analysis, the Agency admits that we must analyze " 'competing policies, goals, and priorities[.]' " (Quoting *Carlson v Green*, 446 US 14, 36; 100 S Ct 1468; 64 L Ed 2d 15 (1980) (Rehnquist, J., dissenting).) As to the

scope of the state's liabilities, we agree that weighing policy considerations to pick and choose which harms the state should be liable for and to what extent is not within our purview. But neither is it within the purview of the Legislature. That consideration has been completed, and those choices are contained within the Constitution.[10] The state is prohibited from violating the rights the Constitution guarantees. If it does so, it is liable for the harm it causes.[11]

But the Agency's position is weaker even than if there were some legislative action in play. As discussed, the Legislature cannot curtail a substantive constitutional right or limit the remedies available to vindicate that right. But the Agency urges us to conclude that *legislative silence* on the issue of remedies for a due-process violation under Const

---

[10] To be sure, adhering to the Constitution places a burden on state government. In recognition of that fact, our Constitution appears to reflect policy considerations. For example, Const 1963, art 1, § 2 provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin," but also that "[t]he legislature shall implement this section by appropriate legislation." Const 1963, art 1, § 11 protects against government searches and seizures in much the same way as US Const, Am IV. However, Const 1963, art 1, § 11 limits application of the exclusionary rule in criminal proceedings, making a different choice than under federal law. Const 1963, art 1, § 14 provides for the right to a jury trial, but allows for 10 out of 12 jurors to reach a verdict in a civil case. Other rights are protected without qualification. Our role is not to evaluate the choices reflected in the Constitution. Our role is to respect and enforce them.

[11] See *In re Town Highway No 20*, 191 Vt 231, 248-249; 2012 VT 17; 45 A3d 54 (2012) ("Thus, the rights enumerated within our Constitution provide no less authority in supporting a cause of action than the rights set out in our statutes or in this Court's precedent, presuming those constitutional rights are found to be self-executing. Indeed, '[t]o deprive individuals of a means by which to vindicate their constitutional rights would negate the will of the people in ratifying the constitution, and neither this Court nor the Legislature has the power to do so.' ") (alteration in original), quoting *Shields v Gerhart*, 163 Vt 219, 223; 658 A 2d 924 (1995).

24

1963, art 1, § 17 somehow signals the ratifiers' intent to preclude any mechanism of enforcement. Under this view, constitutional guarantees that the Legislature has not addressed would be reduced from rights to mere hopes, or as Justice Holmes said, to "ghosts that are seen in the law . . . ." *The Western Maid*, 257 US at 433. This is not our view. See *King v S Jersey Nat'l Bank*, 66 NJ 161, 177; 330 A 2d 1 (1974) ("Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence, and the judicial obligation to protect the fundamental rights of individuals is as old as this country."). If the Legislature has already provided an adequate mechanism to remedy a constitutional tort, this Court is not required to duplicate the effort. However, we emphasize that the Legislature's alternative must be at least as protective of a particular constitutional right as a judicially recognized cause of action and must include any remedy necessary to address the harm caused. To be adequate, the legislative remedy should be at least as protective of constitutional rights as a judicially recognized remedy would be.

## D. THE CONTINUED VIABILITY OF JUSTICE BOYLE'S PARTIAL CONCURRENCE IN *SMITH*

While we agree with the *Smith* majority that a claim for damages against the state arising from a violation of the Michigan Constitution may be recognized in appropriate cases, *Smith*, 428 Mich at 544, we part ways with Justice BOYLE as to how to determine an "appropriate case." As already discussed, in light of this Court's inherent judicial authority and respect for the separation of powers, we believe that a cause of action exists except in two specific circumstances: (1) when the Constitution has delegated to another branch of government the obligation to enforce the constitutional right at issue or (2) when another

25

branch of government has provided a remedy that we consider adequate. While Justice BOYLE also recognized these two exceptions, her partial concurrence suggests that she would have also recognized additional exceptions. Justice BOYLE would presumably have declined to recognize a claim for damages where the existence and clarity of the constitutional violation at issue is unclear and where the degree of specificity of the constitutional protection is unclear. *Id*. at 652 (BOYLE, J., concurring in part and dissenting in part). But while these concerns may caution against imposing liability on the state for violation of a particular constitutional provision under particular factual situations, they speak to whether a right exists or has been violated, not to whether there is a constitutional-damages remedy for that violation. Justice BOYLE would also "consider the text, history, and previous interpretations of the specific provision for guidance on the propriety of a judicially inferred damage remedy." *Id*. at 650. But, as discussed previously, the only concern for the "propriety" of recognizing a damages action should be derived from this Court's inherent judicial authority and the language of the Constitution itself—such as when the Constitution specifically delegates to another branch of government the obligation to enforce the constitutional right. Otherwise, this Court should not be in the business of determining the "propriety" of recognizing a constitutional-damages claim. Likewise, Justice BOYLE's consideration of "various other factors, dependent upon the specific facts and circumstances of a given case," *id*. at 651, is unworkably vague. On this point we agree with the Agency that policy concerns about whether and when to recognize a constitutional-tort remedy are better left to other branches of government. But when the Constitution itself has not delegated to the other branches the authority to weigh those policy concerns, or when the other branches have not stepped in to afford an adequate

26

alternative remedy, our inherent judicial authority requires us to afford a remedy for *all* constitutional violations, not just those that we think are wise or justified.

One final, but important, point of disagreement with Justice BOYLE's partial concurrence in *Smith*: we do not limit the standard of liability in a constitutional-damages claim to a direct standard of liability. Justice BOYLE opined that, consistent with *Monell v New York City Dep't of Social Servs*, 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978), the state's liability for constitutional violations should arise only when the state is acting pursuant to a custom or policy that violates the constitution. In other words, the state cannot be held vicariously liable for the constitutional violations of its employees or agents. *Smith*, 428 Mich at 642-643 (BOYLE, J., concurring in part and dissenting in part). But, in *Monell*, the United States Supreme Court was faced with the question of whether, and when, an entity, such as a municipality, may be held liable under a specific statutory provision, 42 USC 1983, that imposes liability only on "persons." *Monell*, 436 US at 690-691. The Court's adoption of the direct custom or policy theory and rejection of a respondeat superior theory of liability under the statute was, in large part, based on the intent of Congress in adopting the specific statute at issue, the Civil Rights Act of 1871. *Id*. at 665-689. Whatever the merit of the policy concerns considered by Congress in adopting the statute and considered by the Supreme Court in deciding the standard of liability under that statute, we are not in a position to vindicate those policy concerns by incorporating the same reasoning into damages remedies under Michigan's Constitution. While we respect, and may even share, some of Justice BOYLE's "prudential concerns" favoring a direct standard of liability over respondeat superior liability, our obligation is to interpret the Constitution. Weighing policy concerns is the work of other branches in crafting, if they

27

choose, a different, albeit adequate, remedy for constitutional violations.[12]  Absent clear language in the Constitution or a legislatively crafted remedy, we hold that people who have been deprived of a constitutional right deserve to seek redress through the courts, regardless of whether their harm was inflicted pursuant to state custom or policy.[13]

---

[12] The oft-cited prudential concerns favoring direct liability over respondeat superior liability are not beyond debate.  For example, some Courts and legal scholars have opined that imposing direct liability would better deter future constitutional violations.  *Smith*, 428 Mich at 643-644 (BOYLE, J., concurring in part and dissenting in part), citing Note, *Rethinking sovereign immunity after* Bivens, 57 NYU L R 597, 637 (1982).  But others believe that respondeat superior liability affords equal, if not better, opportunities to prevent future harm because it incentivizes the state to train, supervise, and discipline its employees and agents to avoid violations.  See *Brown v New York*, 89 NY2d 172, 194; 674 NE2d 1129 (1996).

[13] Justice VIVIANO worries our decision "represents a massive and amorphous expansion of constitutional tort liability."  Of course, there is nothing new about suing the state for monetary damages.  That has been happening since *Smith*, though the Court of Appeals has generally employed Justice BOYLE'S analysis.  Whatever the difference in outcomes between her analysis and ours, it simply is not our role to place guardrails on constitutional rights based on judicial policy preferences.  Justice VIVIANO worries that our decision poses " 'dangers to liberty,' " but his is the view which would leave fundamental rights merely recognized, but not redressed.  (Citation omitted.)  That is an odd way of thinking about liberty.

Justice VIVIANO mentions liability for cities and villages as well as individuals who operate public utilities.  But our holding is that the *state* is liable for harms it commits in violation of the Constitution; whether other entities, such as municipal governments or individual government actors, can be liable for constitutional torts is not before us, and we decline to address that question in what would be dictum.  Justice VIVIANO also worries about Const 1963, art 9, § 41, which establishes the Michigan game and fish protection trust fund, and whether violations of this provision would be grounds for money damages and if so, to whom; on a similar note, Justice WELCH asserts we should limit our holding to violations of the Declaration of Rights.  Again, we decline to opine on hypothetical cases not before this Court.

## IV. APPLICATION

Plaintiffs allege that the Agency violated their due-process rights by seizing their property without providing them with adequate notice and an opportunity to be heard. Plaintiffs allege that the Agency systematically and unlawfully intercepted their state and federal tax refunds, garnished their wages, and forced them to repay unemployment benefits that they had lawfully received. Plaintiffs allege that the Agency took these actions (1) without providing proper notice or hearing, (2) without allowing plaintiffs to present evidence, and (3) by using a computerized system to detect and determine fraud cases that does not comport with due process. These allegations, if proven, are sufficient to sustain a constitutional-tort claim for a violation of the Due Process Clause of the Michigan Constitution, Const 1963, art 1, § 17, which provides as follows:

> No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.

Nothing in the language of this provision, or any other constitutional provision, confers authority on another branch of government to provide a remedy for violation of this right. Accordingly, the first exception to recognizing a damages action is not met here. In addition, the Legislature has not enacted a statutory remedy that adequately compensates a plaintiff for violation of this due-process right, so the second exception is likewise not present. While the Agency argues that plaintiffs have a remedy in the form of an appeal under the Michigan Employment Security Act, MCL 421.1 *et seq.*, plaintiffs are not challenging the administration of the act and this isn't a "super appeal" from a benefits

determination.[14]  Rather, this is a tort claim challenging the Agency's use of MiDAS to deprive plaintiffs of property without due process of law.  There is no remedy available to vindicate their substantive rights other than an action under the Michigan Constitution.  Administrative agencies don't have the power to determine constitutional questions or afford consequential damages.  See *Dickerson v Warden, Marquette Prison*, 99 Mich App 630, 641-642; 298 NW2d 841 (1980).  And the state's sovereign immunity, guaranteed by the Eleventh Amendment of the United States Constitution, precludes plaintiffs from suing the state in federal court to remedy a violation of either the Michigan Constitution, *Pennhurst State Sch and Hosp v Halderman*, 465 US 89, 121; 104 S Ct 900; 79 L Ed 2d 67 (1984) ("[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."), or a parallel provision of the federal Constitution, *Seminole Tribe of Florida v Florida*, 517 US 44, 55-56; 116 S Ct 1114; 134 L Ed 2d 252 (1996).  Because enforcement of Const 1963, art 1, § 17 has not been delegated to the Legislature and because no other adequate remedy exists to vindicate the alleged violations of plaintiffs' rights, we agree that plaintiffs have alleged a cognizable constitutional-tort claim for which they may recover monetary damages.

---

[14] Regardless, for some in the plaintiff class such as Mr. Broe, the time to appeal the Agency's decisions expired before plaintiffs were aware of the existence of a possible cause of action *because of* the alleged due-process violations.

30

## V. CONCLUSION

Plaintiffs seek redress of the alleged deprivation of their property without notice or an opportunity to be heard in violation of Const 1963, art 1, § 17. This Court bears the authority and ultimate responsibility to enforce our state's Constitution and to ensure that rights have remedies. When the language of the Constitution itself does not delegate that responsibility to another branch of government and when the Legislature has not enacted an adequate alternate remedy for the constitutional violation, we will recognize and enforce a monetary-damages remedy. We agree that plaintiffs have alleged a cognizable constitutional-tort claim for which they may recover money damages, and we agree with the lower courts that the Agency was properly denied summary disposition. We remand the case to the Court of Claims for further proceedings not inconsistent with this opinion.

Megan K. Cavanagh
Bridget M. McCormack
Richard H. Bernstein
Elizabeth M. Welch

31

STATE OF MICHIGAN

SUPREME COURT

GRANT BAUSERMAN, KARL
WILLIAMS, and TEDDY BROE, on Behalf
of Themselves and All Others Similarly
Situated,

        Plaintiffs-Appellees,

v                                      No. 160813

UNEMPLOYMENT INSURANCE
AGENCY,

        Defendant-Appellant.

_____

WELCH, J. (*concurring*).

Today, a majority of this Court confirms that a party has the ability to directly sue the state for monetary damages on the basis of an alleged violation of our Constitution. We have previously recognized these claims and that a remedy for monetary damages exists in appropriate cases. *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987). When the only way to adequately remedy a constitutional violation is to allow for monetary damages, then such a remedy will be implied.[1] The majority opinion adopts a framework

---

[1] Coined by Professor Marshall S. Shapo in his article *Constitutional Tort:* Monroe v. Pape, *and the Frontiers Beyond*, 60 Nw U L Rev 277 (1965), the term "constitutional tort" has evaded a precise definition. See, e.g., Wells, *Marshall Shapo's Constitutional Tort Fifty-Five Years Later*, Nw U L Rev Colloquy (2020), p 257 (describing constitutional torts as "suits for damages for constitutional violations committed by government officials or the governments themselves"), available at <https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1299&context=nulr_online> (accessed July 18, 2022) [https://perma.cc/QR5H-J83K]; Donoghue & Edelstein, *Life After* Brown*: The Future of State Constitutional Tort Actions in New York*, 42 NYL Sch L Rev 447, 449 n 10 (1998) (describing a " 'state constitutional tort' to mean any direct civil action for the violation of

that would allow recognition of monetary damages against the state for the violation of *any* constitutional right if (1) the constitutional right is self-executing, unless the Constitution delegates to a different branch of government discretion in implementing that right, and (2) there is not an adequate alternative remedy. While I agree with the framework and with the holding that plaintiffs pleaded a valid constitutional tort for monetary damages in this matter, I write separately for two reasons. First, I would go further than my colleagues and expressly limit the Court's recognition of monetary damages for constitutional torts to claims arising from a violation of a right enumerated in Michigan's Declaration of Rights, Const 1963, art 1. Accordingly, while I join the majority opinion, I limit my concurrence with Part III of the majority opinion to the extent it could be interpreted to apply beyond a claim under the Declaration of Rights, and I do not join footnote 13 of that opinion to the extent that it declines to adopt such a limitation. Second, the majority's "adequate alternative remedy" requirement limits the "expansion of liability for the state and its taxpayers" that Justice VIVIANO foretells in his dissent. In other words, constitutional-tort

a state constitutional right, with the caveat that state civil rights litigation, like its federal counterpart, does not fit neatly into the area of tort law.").

Generally speaking, the term has been described in academic literature as a direct private civil cause of action to redress the violation of a state constitutional right by a government actor, regardless of the remedy. The default remedies to cure the constitutional violations in such civil actions are often injunctive or declaratory relief, unless some other remedy is provided in a statute or the constitution itself. The Court's decision today concerns a narrower subclass of constitutional torts for which a monetary-damages remedy will be implied because no other adequate alternative common-law, statutory, or administrative remedy exists, and it sets forth the general framework for determining when allowing such a remedy is appropriate.

2

claims are, and will continue to be, rare given that adequate alternative remedies to an implied monetary-damages remedy exist in most cases.

## I. CONSTITUTIONAL TORTS AND THE DECLARATION OF RIGHTS

In Part III of its opinion, the majority has set forth a framework, with which I agree, for recognizing a constitutional tort for monetary damages. I would, however, go further than my colleagues and expressly limit our recognition of constitutional-tort actions for monetary damages to claims based on a violation of the fundamental liberties enumerated in Michigan's Declaration of Rights, Const 1963, art 1. My colleagues in the majority do not consider such a limitation because they "decline to opine on hypothetical cases not before us." *Ante* at 28 n 13. But given that the claim in this matter arises under the Declaration of Rights, I believe addressing this limitation is appropriate.

Our state Constitution has long contained a distinct Bill or Declaration of Rights.[2] Const 1963, art 1; Const 1908, art 2; Const 1835, art 1. Michigan's Declaration of Rights sets forth basic, fundamental individual liberties that are secured to each person in the state. Additionally, we have previously recognized that "[t]he Michigan Declaration of Rights, like the federal Bill of Rights, is 'drawn to restrict governmental conduct and to provide protection from governmental infringement and excesses . . . .' " *Sitz v Dep't of State*

---

[2] This fact sets our Constitution apart from its federal counterpart because the federal Bill of Rights, proposed by our nation's first congress in 1789, was a series of amendments of the original federal Constitution. See, e.g., National Archives and Records Administration, *The Bill of Rights: How Did it Happen?* <https://www.archives.gov/founding-docs/bill-of-rights/how-did-it-happen> (accessed July 13, 2022) [https://perma.cc/GPK7-2NUU]; National Archives and Records Administration, *The Bill of Rights: A Transcription* <https://www.archives.gov/founding-docs/bill-of-rights-transcript> (accessed July 13, 2022) [https://perma.cc/T5XM-66QT].

*Police*, 443 Mich 744, 760; 506 NW2d 209 (1993), quoting *Woodland v Citizens Lobby*, 423 Mich 188, 204; 378 NW2d 337 (1985).  The majority opinion implicitly acknowledges this through its quotation of statements made by Governor John B. Swainson at the constitutional convention of 1961, but a fuller quotation of the Governor's statement is helpful:

> Another of your heavy responsibilities will be review of our constitutional declaration of rights.  As that part of our constitution that guarantees the civil and political integrity, the freedom and independence of our citizens, the bill of rights is the bedrock upon which all else in the constitution may be built. [1 Official Record, Constitutional Convention 1961, p 106 (remarks of Governor John B. Swainson).]

Governor Swainson made similar statements in a letter he provided to the committee examining and proposing amendments of the Declaration of Rights:

> "The drafting of a declaration of rights that will incorporate the distilled wisdom of the past and provide for the protection of individual rights emerging from the social and economic ferment of the twentieth century could very well be the most important and lasting contribution that this convention can make to the preservation of the democratic ideal.

> Other provisions of the fundamental law of the state affect some of us in our relation to state government and the services it provides for us.  But the rights guaranteed by the declaration of rights affect all of us.

> Action by the state to buttress the protection of the individual against the possible tyrannies of bureaucracy, the exploitation, discrimination, invasion of privacy, and unequal access to justice will give strong support to the revitalization of our state.

> *   *   *

> In a society that is becoming more highly organized in groups, the proper expression of these group interests and activities must be harmonized with the urgent necessity to reassert the doctrine that the essential feature of democracy remains the statutes of the individual." [1 Official Record, Constitutional Convention 1961, pp 400-401 (remarks of Governor John B. Swainson).]

4

Professor James K. Pollock, chairman of the committee examining the Declaration of Rights, noted the fundamentals underlying a bill of rights in a statement made on Bill of Rights Day. Pollock explained, "The basic theory underlying the early bills of rights is a belief in the rights of individual men and in rights existing in the law of nature independent of states or their laws, as set forth especially in Locke's Second Treatise on Government (1690)." 1 Official Record, Constitutional Convention 1961, p 403 (remarks of James K. Pollock). Pollock noted that some rights and liberties are so fundamental and individualized that they must be considered "inalienable" in the sense that their execution and protection cannot be fully entrusted to the state. *Id*. In contrast, he noted that other rights and liberties, such as those associated with creating the operational " 'frame' or form of government" have long been considered "alienable" to the extent that they can be entrusted to the state "under proper safeguards for due compensation in the form of just and effective government[.]" *Id*. A bill of rights, Pollock explained, is intended to enumerate the "inalienable rights of the people which they cannot delegate to their government and upon which the latter is explicitly forbidden ever to infringe." *Id*.

When the proposed amendments of the Declaration of Rights were presented to the full body of the convention, the committee recommended movement of the Declaration of Rights from Article 2 to Article 1. Pollock explained why:

> In the committee's opinion[,] the liberties of the people are so fundamental to the Michigan constitution and to free representative government generally that the declaration of rights which establishes the fundamental principles of liberty and sets up the basic legal guideposts for their implementation and enforcement, should appear as the first article in the new constitution. In retaining or altering any present provisions, the committee has carefully considered the exact language in question, as well as committee intent, with the purpose of reducing as far as possible the necessity of judicial

5

construction. [1 Official Record, Constitutional Convention 1961, p 466 (remarks of James K. Pollock).]

The substance of the Declaration of Rights was vigorously debated over many weeks at the constitutional convention, but the core purpose and importance of having a declaration of rights was widely agreed upon.

The notion that monetary recovery is available for the violation of inalienable fundamental liberties set forth in our Constitution aligns with the robust public statements and debate at the constitutional convention of 1961. An untenable situation would arise if the state could violate an individual's fundamental, inalienable rights without the individual having a legal pathway to an adequate remedy. Our fundamental and inalienable liberties would hardly be fundamental at all without such a remedy.

In light of these considerations, I wholeheartedly agree with the majority that the liberties enumerated in the Declaration of Rights are fundamental, and "[w]ithout them, there is nothing." *Ante* at 21. But not everything in our Constitution creates a right that is clearly individualized or inalienable. While Part IV of the majority opinion applies the newly adopted legal framework to a due process claim, the legal analysis in Part III of the opinion is broad enough that it could apply to any alleged violation of any provision of our Constitution, despite the caveats contained in footnote 13. I do not endorse such a broad ruling, even if implicit, given existing law and the arguments that have been presented in this case.

Beyond Article 1, much of the balance of our Constitution focuses on the operational mechanics for state and local government, elections, taxation, and public employment, as well as other more technical details, as Justice VIVIANO's dissent

6

acknowledges. These technical details are the alienable rights and liberties described by Pollock at the constitutional convention of 1961. While the Declaration of Rights must remain a protective backdrop, the degree of individualization of other alienable rights is lessened once the people have entrusted the state with administration of these alienable rights and liberties for the sake of allowing a democratic government to operate. Generally speaking, the violation of nonindividualized, alienable rights that have been entrusted to the state appear poorly suited to vindication through an award of monetary damages against the state. At least one other state Supreme Court appears to have likewise limited monetary-damage remedies for constitutional-tort claims arising under its state's declaration of rights. See *Corum v Univ of N Carolina*, 330 NC 761, 783-786; 413 SE2d 276 (1992).

The constitutional claim before the Court today is premised on a due process violation. The same was true of the constitutional claims at issue in *Smith* and *Mays v Governor*, 506 Mich 157; 954 NW2d 139 (2020). Michigan's Due Process Clause is contained in the Declaration of Rights. Const 1963, art 1, § 17. For the reasons discussed in Part III of the majority opinion, the violation of other rights set forth in the Declaration might also give rise to a facially valid claim seeking monetary compensation for a constitutional tort. But application of the framework in Part III of the majority opinion is not clearly limited to violations of the Due Process Clause or even the Declaration of Rights. Rather, even with the limitations acknowledged in footnote 13, the majority's analysis could plausibly be read to apply to any violation of any provision of the Michigan Constitution. While the majority has not broadly held that the analysis in Part III applies

7

to all violations of Michigan's Constitution, it also has declined to address whether there is any limitation on the application of the Part III framework.

This Court has never given comprehensive consideration to whether a monetary-damages remedy should be recognized for the violation of any right or liberty outside of the Declaration of Rights. In light of the history I have set forth and the cases this Court has considered in the past, I am doubtful that a claim for monetary damages should be recognized in such circumstances, even if all other criteria of the framework the majority adopts today have been satisfied.

It is worth repeating: implying a monetary-damages remedy for constitutional torts is reserved as a "narrow remedy," *Jones v Powell*, 462 Mich 329, 337; 612 NW2d 423 (2000), and when necessary, as an ultimate stop-gap measure to vindicate the constitutional right. I believe a violation of an individualized liberty contained in the Declaration of Rights provides a pathway for an action for monetary damages under some circumstances, but I do not believe the same can be assumed for the rest of our Constitution. Accordingly, while I agree with the analysis in Part III, I limit my concurrence to allowing a monetary-damages remedy only for violations of the Declaration of Rights, Const 1963, art 1, and I do not join footnote 13 of the majority opinion to the extent that it declines to adopt such a limitation.

## II. ADEQUATE ALTERNATIVE REMEDIES

Contrary to Justice VIVIANO's view, I believe that the majority's adequate-alternative-remedy criteria for setting forth a constitutional-tort claim will substantially limit the liability faced by the state. Under the test adopted by the majority today, if there

8

is an adequate alternative remedy that vindicates the violation of a fundamental constitutional right, then monetary damages will not be allowed for violation of that constitutional right. I write separately to emphasize that an adequate remedy need not necessarily make a plaintiff "whole" in every circumstance, and that this limitation provides more protection to the state's coffers than Justice VIVIANO suggests.

Rather, the question is also whether the existing remedy—injunctive relief, declaratory relief, more process, a refund, or whatever it is—will be adequate such that the constitutional right is preserved and not rendered ineffectual. See, e.g., *Lum v Koles*, 314 P3d 546, 556-557 (Alas, 2013) ("The alternative remedies do not need to provide the same level of protection, 'may include federal remedies,' 'need not be an exact match,' and are alternatives even if no longer procedurally available.") (citation omitted). Just as our state courts are well-equipped to determine whether a state constitutional violation has occurred, *In re Apportionment of State Legislature–1982*, 413 Mich 96, 114; 321 NW2d 565 (1982), they are also well-equipped to determine whether adequate alternative remedies exist.

The Legislature will generally be able to manage its potential exposure by providing rights and remedies in legislation so long as those remedies are substantial enough to adequately secure and give meaning to the constitutional right. When there is a legislative scheme at issue, other state supreme courts have deferred to the other branches of government. See, e.g., *Spackman ex rel Spackman v Bd of Ed of Box Elder Co Sch Dist*, 16 P3d 533, 539; 2000 UT 87 (2000) (urging "caution in light of the myriad policy considerations involved in a decision to award damages against a governmental agency and/or its employees for a constitutional violation" and "deference to existing remedies out of respect for separation of powers' principles"); *Binnette v Sabo*, 244 Conn 23, 42-43; 710

9

A2d 688 (1998) (recognizing the separation-of-powers principle and "its requirement for judicial deference to legislative resolution of conflicting considerations of public policy") (quotation marks and citation omitted). Although recognizing it "has the authority to fashion a common law remedy for the violation of a particular constitutional right," the New Hampshire Supreme Court added that it "will avoid such an extraordinary exercise where established remedies—be they statutory, common law, or administrative—are adequate." *Marquay v Eno*, 139 NH 708, 721; 662 A2d 272 (1995)*; see also Dick Fischer Dev No 2, Inc v Dep't of Admin*, 838 P2d 263, 268 (Alas, 1992) (stating same); *Shields v Gerhart*, 163 Vt 219, 234-235; 658 A2d 924 (1995) ("Where the Legislature has provided a remedy, although it may not be as effective for the plaintiff as money damages, we will ordinarily defer to the statutory remedy and refuse to supplement it.").

These cases are persuasive. There is an ongoing relationship between the roles of the different branches of government that deserves respect. Unless monetary damages are necessary to secure and vindicate a violation of a constitutional right, it is inappropriate to second-guess policy-type decisions of the Legislature or the Executive Branch regarding how to remedy violations of legal rights under a statutory scheme. The threshold question for judges is whether a remedy is adequate, not whether it is ideal or equally comprehensive. In practice, it appears that courts in other states have held that adequate alternative remedies preclude a constitutional remedy for monetary damages under many circumstances.[3]

---

[3] See, e.g., *Fields v Mellinger*, 244 W Va 126, 129-136; 851 SE2d 789 (2020) (declining to recognize a constitutional tort for money damages on the basis of alleged employment discrimination because there were adequate alternative remedies under common-law actions and state and federal statutes); *Salminen v Morrison & Frampton, PLLP*, 377 Mont

10

244, 255; 2014 MT 323; 339 P3d 602 (2014) ("Since the Salminens have a basis in law for a claim to redress this allegation, they need not proceed under the Constitution."); *Lum*, 314 P3d at 556-557 (holding that there were adequate alternative remedies because the plaintiff "could have brought a common-law trespass claim or a federal civil rights action under 42 U.S.C. § 1983"); *Boatright v Glynn Co Sch Dist*, 315 Ga App 468, 471; 726 SE2d 591 (2012) (rejecting the plaintiff's constitutional-tort claim on the basis that the plaintiff's prior request for mandamus relief and claims asserted under Ga Code Ann 20-2-940 would have provided adequate state remedies had plaintiff not dropped the claims); *St Luke Hosp, Inc v Straub*, 354 SW3d 529, 537-538 (Ky, 2011) (noting that traditional common-law tort actions were available and provided adequate alternative remedies for the alleged violation of the defendant's rights under the state constitution); *Khater v Sullivan*, 160 NH 372, 374; 999 A2d 377 (2010) (holding that the plaintiffs had adequate alternative statutory remedies through the appeal process for zoning and land-use decisions); *Giraldo v Dep't of Corrections & Rehabilitation*, 168 Cal App 4th 231, 255-256; 85 Cal Rptr 3d 371 (2008) (holding that adequate alternative remedies existed for the asserted cruel-and-unusual-punishment claim under the state constitution because the plaintiff could have filed a claim under 42 USC 1983); *Sunburst Sch Dist No 2 v Texaco, Inc*, 338 Mont 259, 279-280; 2007 MT 183; 165 P3d 1079 (2007) (holding that the recent adoption of Restatement Torts, 2d, § 929 to allow for the recovery of restoration damages meant that the district court had "erred in instructing the jury on the constitutional tort theory where . . . adequate remedies exist[ed] under statutory or common law"); *Lowell v Hayes*, 117 P3d 745, 754 (Alas, 2005) (holding that the existence of a viable defamation claim was an adequate alternative remedy and noting that "the inadequacy of alternative remedies for alleged constitutional violations cannot be measured *per se* by the dismissal or defeat of those remedies"); *Degrassi v Cook*, 29 Cal 4th 333, 342-343; 58 P3d 360 (2002) (holding that a timely action for injunctive relief, if meritorious, would have adequately remedied the complained of conduct); *Lyles v New York*, 194 Misc 2d 32, 36-37; 752 NYS2d 523 (2002) (holding that adequate remedies could have been obtained through various common-law tort theories and that there was no need, therefore, to imply a constitutional-tort remedy for money damages); *Martinez v Schenectady*, 97 NY2d 78, 83-84; 761 NE2d 560 (2001) (holding that a tort claim for money damages was unavailable because reversal of the plaintiff's prior conviction provided an adequate remedy); *Marquay*, 139 NH at 722 (holding that common-law tort and statutory causes of action provided adequate remedies even if not as " 'complete' as would be an additional constitutional tort"); *Davis v Town of Southern Pines*, 116 NC App 663, 675-676; 449 SE2d 240 (1994) (holding that plaintiff's "constitutional right not to be unlawfully imprisoned and deprived of her liberty [was] adequately protected by her common law claim of false imprisonment" and that she could therefore not bring a constitutional-tort claim); *Rockhouse Mountain Prop Owners Ass'n, Inc v Town of Conway*, 127 NH 593, 598-599; 503 A2d 1385 (1986) (holding that alternative adequate remedies existed for the plaintiff's equal protection claim because its

11

This case concerns an alleged procedural due process violation that allegedly caused substantial financial loss for the plaintiffs beyond what was garnished and later returned with no established legal path to recovery. In most cases, I fully expect that the remedy for a violation of procedural due process will be more process.[4] The way to remedy procedural due process violations has historically been through additional process afforded in equity by courts, not monetary damages. Unless a well-trained lawyer is going to supervise every single instance of official action that could affect a private interest, there are bound to be procedural due process violations (even in the form of a mistake). Unsurprisingly, other state supreme courts have likewise been hesitant to recognize a constitutional tort with an attendant monetary-damages remedy for procedural due process violations. See, e.g., *Spackman*, 16 P3d at 539; *Carlsbad Aquafarm, Inc v State Dep't of Health Servs*, 83 Cal App 4th 809, 821, 822; 100 Cal Rptr 2d 87 (2000) (recognizing a litigant complaining of lack of procedural due process "had an alternative remedy" because it "could have immediately petitioned the superior court for a writ of mandate ordering [the defendant] to provide it with due process" and that it was not the "role of the judiciary to create a damages action merely to provide a more 'complete' remedy"). However, in light of the remarkable and extraordinary allegations of systemic due process violations in this

---

membership had a statutory right to seek de novo review of the decision not to construct and maintain roads to their homes).

[4] The Utah Supreme Court has stated that "procedural due process claims would appear to be particularly amenable to redress through equitable means" exactly because "a court can generally require the offending party to redo correctly the 'procedure' that allegedly lacked the mandated safeguards." *Spackman*, 16 P3d at 539 n 11.

case, I agree with the Court of Appeals and my colleagues in the majority that additional process would be an inadequate remedy and that allowing for monetary damages is justified in this case.

### III.  CONCLUSION

For the reasons already discussed, I concur with the majority that a claim against the state for monetary damages can be recognized for certain constitutional violations and with the holding that a claim for monetary damages is appropriate in this case.  While I agree with the legal framework and analysis in Part III of the majority opinion, I qualify my concurrence with the majority opinion in the manner previously discussed.  Finally, while I appreciate Justice VIVIANO's concerns, I believe the requirement that no adequate alternative remedy exist before a monetary-damages remedy can be implied will ensure that recognition of such a remedy for constitutional-tort claims will remain relatively rare.

Elizabeth M. Welch

STATE OF MICHIGAN

SUPREME COURT

GRANT BAUSERMAN, KARL
WILLIAMS, and TEDDY BROE, on Behalf
of Themselves and All Others Similarly
Situated,

        Plaintiffs-Appellees,

v                                      No. 160813

UNEMPLOYMENT INSURANCE
AGENCY,
        Defendant-Appellant.

_____

VIVIANO, J. (*dissenting*).

Our Constitution establishes the structure of our government, its powers and limits, and the rights of the people.[1] After today's decision, the Constitution will also provide individuals with a cause of action for money damages when their constitutional rights are violated if the Legislature has not provided a remedy that a majority of this Court deems "adequate." This represents an expansion of liability for the state and its taxpayers, without any legal grounding. In fashioning this new cause of action for monetary damages, the Court wields legislative power, unjustified by our common-law authority or the text and history of the Constitution itself. I would instead hold that this Court has no power to create these new causes of action and would overrule our caselaw suggesting otherwise.

_____

[1] Friedman, *A History of American Law* (New York: Simon & Schuster, 2005), p 74.

## I. *SMITH*, *BIVENS*, AND THE SEPARATION OF POWERS

I believe that it is a violation of the separation of powers for courts to create causes of action for money damages for constitutional violations. The fashioning of remedies for constitutional wrongs is the work of the legislative branch, not the courts. While we have authority over the common law, it is a gross abuse of that authority to create causes of action for damages in these circumstances.

### A. CASELAW

Today, for the first time in Michigan's history, a majority of this Court has held that a plaintiff has properly alleged a claim for money damages to redress a violation of Michigan's 1963 Constitution. In the handful of our cases addressing this general subject, we have recognized the possibility that violations of the Constitution could result in a cause of action for monetary damages, but we have never before found such a cause of action. Our initial decision establishing that such claims exist came in the hopelessly fractured memorandum opinion in *Smith v Dep't of Pub Health*.[2] The Court issued a brief memorandum opinion signed by all six participating justices; that opinion simply listed six propositions that at least four of the participating justices agreed upon, two of which were:

> 5) Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action.

> 6) A claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases.[3]

---

[2] *Smith v Dep't of Pub Health*, 428 Mich 540; 410 NW2d 749 (1987).

[3] *Id*. at 544, 545.

"The *Smith* opinion was silent as to why a majority of the Court had agreed on these tenets."[4] As my partial dissent in *Mays v Governor*[5] explained, the Court's memorandum opinion was followed by four separate opinions written or joined by the participating justices. Justice BOYLE set forth the test that, until today, was applied by the lower courts and this Court.[6] Under her test, courts should analyze the following factors when determining whether to infer a damages remedy for violations of the Constitution caused by a custom or policy:

> (1) the existence and clarity of the constitutional violation itself, (2) the degree of specificity of the constitutional protection, (3) support for the propriety of a judicially inferred damages remedy in any "text, history, and previous interpretations of the specific provision," (4) "the availability of another remedy," and (5) "various other factors" militating against a judicially inferred damages remedy.[7]

In neither of the two consolidated appeals we addressed in *Smith* did the Court infer a damages claim: in one appeal, we determined that the plaintiff had failed to preserve the argument, and in the other appeal, we remanded for a determination of whether a

---

[4] *Mays v Governor*, 506 Mich 157, 188; 954 NW2d 139 (2020) (plurality opinion by BERNSTEIN, J.).

[5] *Id*. at 246 & n 52 (VIVIANO, J., concurring in part and dissenting in part).

[6] See *id*. at 196 (plurality opinion by BERNSTEIN, J.) ("[W]e agree with the Court of Claims and the Court of Appeals that the multifactor test elaborated in Justice BOYLE's separate opinion in *Smith* provides a framework for assessing the damages inquiry.").

[7] *Id*. at 247 (VIVIANO, J., concurring in part and dissenting in part), quoting *Smith*, 428 Mich at 648-652 (BOYLE, J., concurring in part and dissenting in part).

constitutional violation occurred and, if so, "whether it is one for which a damage remedy is proper."[8]

We have addressed the subject of inferred damages claims in only three other cases. In *Jones v Powell*, we characterized *Smith* as a "narrow remedy."[9] In that case, the plaintiff sued the city of Detroit as well as the Detroit police officers who had stormed her house and searched it because they falsely believed a fleeing suspect had entered the house. We affirmed the Court of Appeals' ruling "that our decision in *Smith* provides no support for inferring a damage remedy for a violation of the Michigan Constitution in an action against a municipality or an individual government employee" because those plaintiffs had adequate alternative remedies under federal law.[10] In *Lewis v Michigan*, we declined to infer a cause of action under the Equal Protection Clause of our Constitution, Const 1963, art 1, § 2, because that provision expressly states it will be implemented by the Legislature.[11] Finally, in *Mays*, only a plurality of the Court supported inferring a damages claim under Justice BOYLE's test for due-process claims for violation of the right to bodily integrity.[12]

---

[8] *Smith*, 428 Mich at 545.

[9] *Jones v Powell*, 462 Mich 329, 337; 612 NW2d 423 (2000).

[10] *Id*. at 331, 335, 337.

[11] *Lewis v Michigan*, 464 Mich 781, 782, 787; 629 NW2d 868 (2001).

[12] *Mays*, 506 Mich at 195-200 (plurality opinion by BERNSTEIN, J.).

4

The Court's caselaw is clearly undergirded by the United States Supreme Court's decision in *Bivens v Six Unknown Named Agents of Fed Bureau of Narcotics*.[13] In *Bivens*, the Supreme Court concluded that the plaintiff had stated a cause of action for money damages for violation of the Fourth Amendment.[14] But as I have explained, *Bivens* offers a shaky foundation for our caselaw, and the Supreme Court has recognized *Bivens*-style damages claims on only two other occasions.[15] From the outset, and continuing today, "*Bivens* was criticized . . . as posing separation-of-powers concerns" because the creation of damages remedies involves inherently policy-based considerations that fall within the Legislature's purview, not the judiciary's.[16] As the United States Supreme Court stated

---

[13] *Bivens v Six Unknown Named Agents of Fed Bureau of Narcotics*, 403 US 388; 91 S Ct 1999; 29 L Ed 2d 619 (1971); see also *Mays*, 506 Mich at 251-263 (VIVIANO, J., concurring in part and dissenting in part) (discussing *Bivens*).

[14] *Bivens*, 403 US at 397.

[15] *Mays*, 506 Mich at 257 (VIVIANO, J., concurring in part and dissenting in part), citing *Davis v Passman*, 442 US 228; 99 S Ct 2264; 60 L Ed 2d 846 (1979), and *Carlson v Green*, 446 US 14; 100 S Ct 1468; 64 L Ed 2d 15 (1980).

[16] *Mays*, 506 Mich at 253-255 (VIVIANO, J., concurring in part and dissenting in part) (noting that Congress, rather than the courts, would most often be the branch to establish damages remedies because the "issue ' "involves a host of considerations that must be weighed and appraised" ' " and thus "should be committed to ' "those who write the laws" ' rather than ' "those who interpret them" ' "), quoting *Ziglar v Abbasi*, 582 US ___; 137 S Ct 1843, 1857; 198 L Ed 2d 290 (2017) and *Carlson*, 446 US at 37 (Rehnquist, J., dissenting) ("[C]ongressional authority here may all too easily be undermined when the judiciary, under the guise of exercising its authority to fashion appropriate relief, creates expansive damages remedies that have not been authorized by Congress."); *Bivens*, 403 US at 411-412 (Burger, C.J., dissenting) ("We would more surely preserve the important values of the doctrine of separation of powers—and perhaps get a better result—by recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power. Legislation is the business of the Congress, and it has the facilities and competence for that task—as we do not.").

just this year, "Now long past 'the heady days in which this Court assumed common-law powers to create causes of action,' . . . we have come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power . . . .' "[17]  "At bottom," the Court continued, "creating a cause of action is a legislative endeavor."[18]  The Court appears to have limited *Bivens* and the two other cases allowing damages to their exact factual circumstances, and multiple justices have called for overruling this line of caselaw.[19]  The Court will now refuse to create a cause of

---

[17] *Egbert v Boule*, 596 US ___, ___; 142 S Ct 1793; ___ L Ed 2d___ (2022); slip op at 6.

[18] *Id*. at ___; slip op at 6.  See also *id*. at ___ (Gorsuch, J., concurring); slip op at 1  ("Our Constitution's separation of powers prohibits federal courts from assuming legislative authority.  As the Court today acknowledges, *Bivens* . . . crossed that line by 'impl[ying]' a new set of private rights and liabilities Congress never ordained.") (alteration in original); *id*. at ___ (Gorsuch, J., concurring); slip op at 2 ("To create a new cause of action is to assign new private rights and liabilities—a power that is in every meaningful sense an act of legislation.").

[19] As discussed in *Mays*, the United States Supreme Court recently observed:

> We have stated that expansion of *Bivens* is "a 'disfavored' judicial activity," and have gone so far as to observe that if "the Court's three *Bivens* cases [had] been . . . decided today," it is doubtful that we would have reached the same result.  And for almost 40 years, we have consistently rebuffed requests to add to the claims allowed under *Bivens*.  [*Mays*, 506 Mich at 257 (VIVIANO, J., concurring in part and dissenting in part) (alteration in original), quoting *Hernández v Mesa*, 589 US ___, ___; 140 S Ct 735, 742-743; 206 L Ed 2d 29 (2020).]

See also *Egbert*, 596 US at ___ (opinion of the Court); slip op at 17 (noting same).  Justices Clarence Thomas and Neil Gorsuch have called for overruling *Bivens*.  See *id*. at ___ (Gorsuch, J., concurring); slip op at 3 ("I would only take the next step and acknowledge explicitly what the Court leaves barely implicit" and overrule *Bivens*.); *Hernández*, 589 US at ___; 140 S Ct at 750 (Thomas, J., concurring) ("I write separately because, in my view, the time has come to consider discarding the *Bivens* doctrine altogether.  The foundation for *Bivens*—the practice of creating implied causes of action in the statutory context—has already been abandoned.  And the Court has consistently refused to extend the *Bivens*

action for money damages if "there is any reason to think that Congress might be better equipped to create a damages remedy."[20]

## B. SEPARATION OF POWERS

I continue to believe that "[t]he critiques of *Bivens* apply equally to *Smith*," which "poses the same separation-of-powers concerns that *Bivens* does."[21]  I cannot see how a damages

> remedy is required when the text of neither the United States nor the Michigan Constitution mentions it.  Rather, both Constitutions vest their respective legislative branches with the legislative power.  This power encompasses the power to create causes of action.  While there may be a narrow category of cases for which there is no state tort law cause of action and for which damages appear to be the only effective remedy, I am skeptical that these practical concerns justify allowing the courts to exercise the legislative power by implying causes of action when the Legislature has not seen fit to create a statutory cause of action.[22]

The constitutional separation of powers protects against the threat posed by unrestrained judicial lawmaking.  "Lawmaking, the framers of the federal Constitution believed, should be difficult because it poses dangers to liberty; thus, federal statutes require passage by two legislative bodies and approval by the executive to become law."[23]

doctrine for nearly 40 years, even going so far as to suggest that *Bivens* and its progeny were wrongly decided.").

[20] *Egbert*, 596 US at ___ (opinion of the Court); slip op at 7.

[21] *Mays*, 506 Mich at 260 (VIVIANO, J., concurring in part and dissenting in part).

[22] *Id*. at 259 (citations omitted).

[23] *In re Certified Questions from United States District Court, Western District of Mich*, 506 Mich 332, 415; 958 NW2d 1 (2020) (VIVIANO, J., concurring in part and dissenting in part), citing *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2131; 204 L Ed 2d 522 (2019) (Gorsuch, J., dissenting).

7

"Our own Constitution, of course, reflects these same requirements."[24]   Indeed, our Constitution contains express protection of the separation of powers not contained even in the federal Constitution.[25]  "[T]hese hedges against hasty lawmaking and the separation of powers . . . were . . . meant to 'respect[] the people's sovereign choice to vest the legislative power' in one branch alone and to 'safeguard[] a structure designed to protect their liberties, minority rights, fair notice, and the rule of law.' "[26]  These protections are obliterated when the judiciary takes it upon itself to craft monetary damages for constitutional violations.   The creation of that liability, dependent upon policy considerations that the judiciary is institutionally ill-suited to address, is a task that falls within the legislative sphere.[27]

Some have suggested, however, that state courts, unlike federal courts, are suited to the task of creating causes of action under our common-law powers, which federal courts

---

[24] *In re Certified Question*, 506 Mich at 415 (VIVIANO, J., concurring in part and dissenting in part), citing Const 1963, art 4, §§ 24 and 33.

[25] See 1963 Const., art 3, § 2 ("No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.").

[26] *In re Certified Question*, 506 Mich at 416 (VIVIANO, J., concurring in part and dissenting in part) (alteration in original), quoting *Gundy*, 588 US at ___; 139 S Ct at 2135 (Gorsuch, J., dissenting).

[27] See, e.g., *Egbert*, 596 US at ___ (opinion of the Court); slip op at 6 (noting the " 'range of policy considerations' " required, including economic concerns, costs, and effects on governmental operations) (citation omitted).  The Legislature is better positioned to address these issues, including the argument that damages remedies for constitutional violations have little deterrent effect (and might even have a perverse incentive effect) on governmental actors because those actors do not internalize costs the same way that private actors do.  See Levinson, *Making Government Pay: Markets, Politics, and the Allocation of Constitutional Costs*, 67 U Chi L Rev 345, 345-348, 367-373, 402-406 (2000).

lack.[28]  In declining to extend *Bivens*, the Supreme Court has noted that it does not have

common-law authority.[29]  This is taken by some as a signal that a common-law court, such

as ours, has a free hand to fashion tort-based causes of action for monetary damages.  The

cause of action would be separate from the constitutional provision in the sense that the

tort would not arise from or be required by the state Constitution itself.  It would, instead,

---

[28] See Bowers, *The Implied Cause of Action for Damages Under the Idaho Constitution*, 56 Idaho L Rev 339, 350 (2020) ("The most important distinction between state and federal courts with regard to *Bivens* actions . . . is the differing scope of jurisdiction in state and federal courts.  Judicial implication of damages remedies may pose knotty questions in Article III courts of limited jurisdiction, but it is widely accepted that 'state courts remain common-law generalists with equitable and inherent authority to create law, shape policy, and devise remedies.' ") (citations omitted).

Although there is some ambiguity on this point in the majority opinion, the majority does not appear to rely on this rationale, instead purporting to find the right to a damages remedy as inherent in the Constitution itself.  See note 39 of this opinion (discussing the majority's justifications for its holding).  Nonetheless, because no such right exists in the Constitution (as explained below), the majority's action must ultimately rest on the judicial creation of a freestanding tort.  It is therefore necessary to examine our power in this regard. Numerous common-law courts have considered their power to create torts for constitutional violations independent from any such cause of action arising from the constitutional text.  See, e.g., *Spackman ex rel Spackman v Bd of Ed of Box Elder Co Sch Dist*, 16 P3d 533, 537-538; 2000 UT 87 (2000) (explaining that "[i]n the absence of applicable constitutional or statutory authority" for a right to damages for constitutional violations, "Utah courts employ the common law," and "a Utah court's ability to award damages for violation of a self-executing constitutional provision rests on the common law"); cf. *Cantrell v Morris*, 849 NE2d 488, 505-507 (Ind, 2006) (recognizing that a damage remedy might "arise[] under the state Constitution itself or under state common law tort doctrines" but finding "little practical significance" between the two modes and holding that any damages remedy would be limited by statutory immunities for governmental actors); *Beaumont v Bouillion*, 896 SW2d 143, 150 (Tex, 1995) (rejecting the argument that "we may look to the Constitution to define the element of duty for a Texas common law cause of action").

[29] See *Hernández*, 589 US at ___; 140 S Ct at 742 ("With the demise of federal general common law, a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress . . . .").

9

be a pure act of judicial lawmaking. One scholar, concluding that *Bivens* could not be justified as an exercise of constitutional interpretation, thought that decision was an exercise of "preemptive lawmaking" in the mold of the common law.[30]

Putting it in those stark terms underscores the activism inherent in the enterprise. And this view fundamentally misunderstands our common-law powers. As explained more fully later in this opinion, we certainly do not claim that power when it comes to statutes, and there is no history supporting the creation of such torts for violations of the Constitution. It goes well beyond our role as the principal steward of the common law:

> Acting in [our capacity as the principal steward of Michigan's common law], we have on occasion allowed for the development of the common law as circumstances and considerations of public policy have required. See, e.g., *Berger* [*v Weber*, 411 Mich 1; 303 NW2d 424 (1981)]. But as Justice YOUNG has recently observed, our common-law jurisprudence has been guided by a number of prudential principles. See Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 305-310 (2004). Among them has been our attempt to "avoid capricious departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences," *id*. at 307[.][31]

---

[30] See Merrill, *The Common Law Powers of Federal Courts*, 52 Univ Chi L Rev 1, 51-52 (1985) ("By definition, the remedy in question is not authorized by the text itself. . . . Thus, as a general matter, it is unlikely that an examination of the structure and history of the enactment will yield evidence of a specific intent to create such a remedy. . . . But for the most part, the techniques of conventional interpretation will not authorize judicial creation of remedies beyond those expressly provided by Congress. At this point, however, the doctrine of preemptive lawmaking comes into play. Although at first blush it may seem odd to apply the concept of preemptive lawmaking in order to *create* additional remedies, the underlying rationale is essentially the same in this context as it is when a court finds it necessary to preempt or supplement state substantive rules in order to preserve federal statutory policies.") (citations and paragraph structure omitted).

[31] *Henry v Dow Chemical Co*, 473 Mich 63, 83; 701 NW2d 684 (2005).

We went on to explain that the judiciary has an "obligation to exercise caution and to defer to the Legislature when called upon to make a new and potentially societally dislocating change to the common law" and that separation-of-powers concerns support this cautious approach.[32]  Indeed, the very concept of the common law defies innovation given that it is defined as "custom."[33]

To the extent the majority's decision today is grounded on the Court's common-law powers, it dangerously aggrandizes those powers.  The decision represents a massive and amorphous expansion of constitutional tort liability.  Under the majority's decision, unless the Constitution provides otherwise, or the Legislature has established a remedy that *we* deem adequate, damages will lie for a constitutional violation.  How will we know when the Legislature's alternative remedy is "adequate"?  When it is "at least as protective of a particular constitutional right as a judicially recognized cause of action," and it "must include any remedy necessary to address the harm caused." *Ante* at 25.  In other words,

---

[32] *Id*. at 89.

[33] Boorstin, *The Mysterious Science of the Law: An Essay on Blackstone's Commentaries* (Chicago: University of Chicago Press, 1969), pp 73-74 ("Indeed, all the virtues of tradition seemed to be inherent in the very definition of the English common law because, after all, the common law was rooted in custom.  The definition of the common law as custom, at the same time that it allowed Blackstone to attribute to the law the virtues of those early times in which English law had originated, permitted him to find in the law the accumulated wisdom of all the ages since.  And who would dare to set his private stock of wisdom against the accrued capital of wisdom of all the past? . . . 'Custom, which is the life of the common law,' derived much of its validity from the presumption in favour of the products of experience.") (citation omitted).

the Legislature's remedy will be adequate if it is that which we would have come up with ourselves. This leaves no guidance whatsoever.[34]

More importantly, what is the scope of the Court's holding—will the violation of any provision of the Constitution result in damages, or only the violation of certain provisions? Although the opinion appears to focus on the provisions in the Declaration of Rights, the opinion also presents its holding in sweeping terms, stating that "when the Constitution itself has not delegated to the other branches the authority to weigh those policy concerns, or when the other branches have not stepped in to afford an adequate alternative remedy, our inherent judicial authority requires us to afford a remedy for *all* constitutional violations . . . ." *Ante* at 26-27.

While only three justices appear to leave open the possibility that implied causes of action for damages could be found outside the Constitution's Declaration of Rights, it is worth explaining why such a view cannot (and should not) garner majority support. Our Constitution, unlike the federal Constitution, contains a host of more technical details that have now become potential tripwires for money-damages claims, including many that would seem to bear little relation to individual rights. Cities and villages, for example, cannot acquire certain public utilities unless the transaction is first approved by the voters.[35] Individuals and entities that operate public utilities cannot use various public places to run wire and other utility facilities without first obtaining a franchise from the pertinent local

---

[34] Justice WELCH characterizes the majority's adequate-alternative-remedy requirement as limited, suggesting that it will not require the Legislature to provide for monetary relief "in every circumstance[.]" Whether this proves true remains to be seen; the majority opinion offers no such assurances.

[35] Const 1963, art 7, § 25.

government.[36]  Our Constitution establishes a "game and fish protection trust fund" and establishes how it shall be financed and managed.[37]  Are violations of these provisions grounds for money damages?  And if so, to whom?  These ambiguities are present in more central provisions as well.  For example, our Constitution requires that the Independent Citizens Redistricting Commission adopt redistricting plans with districts of equal population.[38]  How would money damages remedy a violation of this provision?

The Court's decision today portends a staggering extension of liability that is alien to the incremental and customs-based nature of the common law.  The decision cannot be justified as a proper use of common-law authority.  Accordingly, I believe that the creation of money-damages claims for constitutional violations is a legislative function.  It is therefore a violation of the separation of powers for the Court to step in and create such claims.

---

[36] Const 1963, art 7, § 29.  The majority opinion claims that these examples of provisions on municipalities are irrelevant because the opinion is limited to the potential liability of the *state*, not municipalities.  But the opinion fails to offer any principled reason for interpreting other provisions as allowing damages remedies, but not these.  That is, if the damages remedy is truly just an interpretation of the Constitution, the opinion cites no language or principle that would limit the remedy to claims against the state.  To the extent the opinion rests upon the "rights"-giving provisions of the Constitution, it never expressly limits its reasoning to those provisions.  Rather, three of the four justices in the majority decline to decide whether the holding applies outside of violations of the Declaration of Rights or other possible rights in the Constitution.  Even if the holding is eventually limited to violations of constitutional "rights," those three justices never explain how a court is to determine whether a provision grants a right for purposes of the majority's holding.  For example, does a resident have a "right" to vote on whether a city can acquire public utilities?  See Const 1963, art 7, § 25.  Their attempt to clarify and limit their holding by pure ipse dixit is bound to create confusion.

[37] Const 1963, art 9, § 41.

[38] Const 1963, art 4, § 6(13)(a).

## II. CONSTITUTIONAL TORTS AS CONSTITUTIONAL INTERPRETATION

Perhaps because of the stunning sweep of today's holding, and concerns with the separation of powers, the majority purports to ground its decision in the Constitution itself, suggesting that the remedy crafted today is constitutionally required.[39]  A cause of action established by the text would arguably avoid the separation-of-powers concerns noted above.  But the majority never bothers with any textual analysis and only gestures vaguely at historical practices.  Neither text nor history suggest any hidden causes of action for constitutional violations generally, nor do they reveal a cause of action for the provision at issue here, the Due Process Clause.

---

[39] I read the majority opinion as attempting to ground its holding in the Constitution itself rather than the Court's authority over the common law.  Somewhat confusingly, however, the majority at times suggests that its holding rests on inherent judicial power, implying that the damages remedies created today are creatures of the common law (or some other ambiguous source) rather than requirements arising from the constitutional text itself.  Compare *ante* at 2 ("Inherent in the judiciary's power is the ability to recognize remedies, including monetary damages, to compensate those aggrieved by the state . . . for violating the Michigan Constitution . . . ."), *ante* at 26-27 ("But when the Constitution itself has not delegated to the other branches the authority to weigh . . . policy concerns, or when the other branches have not stepped in to afford an adequate alternative remedy, our inherent judicial authority requires us to afford a remedy for *all* constitutional violations . . . ."), and *ante* at 7 ("[T]his Court retains the authority—indeed the duty—to vindicate the rights guaranteed by our Constitution."), with *ante* at 18-19 ("Our holding today is grounded in the constitutional rights relied on by plaintiffs as well as our authority and duty to say what the law is."), and *ante* at 21 ("What plaintiffs ask of us is not to make new law under the Constitution but, rather, to enforce the Constitution itself.").  One would hope that with such a momentous holding, the majority would take greater pains to locate and specify the grounds for its holding rather than serving up vague platitudes.  In any case, for the reasons addressed in this dissent, the majority errs no matter which basis its opinion ultimately employs.

## A. INTERPRETING THE CONSTITUTIONAL TEXT

Some courts and scholars have asserted that looking to the Constitution itself is the proper approach to constitutional torts. The Supreme Court has acknowledged that *Bivens* simply extended the then-regnant interpretive practice of inferring causes of action from statutes.[40] As another example, the Oregon Supreme Court looked for any "textual or historical basis" in that state's bill of rights "for implying a right to damages for constitutional violations," finding no such basis.[41] Our decision in *Lewis* was likewise grounded in the text: because the constitutional provision at issue entrusted its implementation to the Legislature, the Court would not infer a damages remedy.[42] The

---

[40] *Hernández*, 589 US at ___; 140 S Ct at 741; see also *Katzberg v Regents of Univ of California*, 29 Cal 4th 300, 314; 58 P3d 339 (2002) ("[M]ost California decisions issued during the past two decades . . . have viewed the determinative question as whether an action for damages exists in (or can be inferred from) the constitutional provision at issue. Accordingly, most of the recent California decisions expressly focus their analysis upon whether the provision at issue was *intended*, either expressly or impliedly, to afford relief in damages."). Some who disagree that *Bivens* can be justified by constitutional interpretation have nonetheless noted that *Bivens* purported to ground its decision as an interpretation of the Constitution. Monaghan, *Forward: Constitutional Common Law*, 89 Harv L Rev 1, 24 (1975) ("The majority opinion [in *Bivens*] apparently derives the right to damages from the fourth amendment itself. But, unless the Court views a damage action as an indispensable remedial dimension of the underlying guarantee, it is not constitutional interpretation, but common law.") (citations omitted).

[41] *Hunter v Eugene*, 309 Or 298, 303; 787 P2d 881 (1990); see also *Bouillion*, 896 SW2d at 148-149 (examining the text and history of the provisions in deciding that there was no cause of action for damages when the state constitutional rights of speech and assembly were violated).

[42] *Lewis*, 464 Mich at 786.

Restatement likewise seems to locate the activity of implying damages in the interpretive sphere.[43]

But to infer causes of action for money damages from the constitutional text requires a contortion of interpretive principles. This contortion was commonplace when *Bivens* was decided, and the Court extended the practice to the constitutional sphere. At that time, the United States Supreme Court generally read private causes of action into statutes.[44] The

---

[43] See Restatement Torts, 2d, § 874A, p 301 ("When a legislative provision [which is defined to include the Constitution] protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action."). Although the Restatement suggests that the action is a tort, the comments indicate that the process of inferring a civil remedy is tied to interpretation. The Restatement centers the analysis on discovering legislative intent, even though the effectuation of that intent might be a court-created tort cause of action. Restatement, § 874A, comments *c* and *d*, p 302 ("If the court determines that the legislative body did actually intend for civil liability to be imposed or not imposed, whether the intent is explicit or implicit, then the court should treat the situation as if it had expressly so provided. . . . If this was the intent of the legislative body, a study of the text of the provision, including the title and preamble, if any, will often disclose the fact. Tracing the legislative history may sometimes prove helpful. Some courts give careful attention to this source, while others decline to allow it to be considered at all. . . . If the court has reached the conclusion that the legislative body did actually have the intent either to establish a civil remedy to protect and enforce the right or to limit the relief to that expressly provided for in the legislative provision, the issue is settled, and the court is warranted in declaring that it is complying with the legislative intent.") (paragraph structure omitted); but see *Katzberg*, 29 Cal 4th at 325 (suggesting that the Restatement calls for the "exercise [of] . . . authority over the common law" to, "in appropriate circumstances, recognize a tort action for damages to remedy a constitutional violation").

[44] *Mays*, 506 Mich at 256 (VIVIANO, J., concurring in part and dissenting in part) (" '*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition.' "), quoting *Correctional Servs Corp v Malesko*, 534 US 61, 75; 122 S Ct 515; 151 L Ed 2d 456 (2001) (Scalia, J., concurring).

understanding was that this approach effectuated the legislative purpose behind a statute.[45]

But the Court has "abandoned" that view,[46] and the touchstone of the present test for implied causes of action has been whether the text and structure of a statute displayed the legislature's intent to create such a cause of action.[47] Therefore, a private cause of action should only be implied from the fair import of the statute's text.[48] A judicially created private remedy in a statute that does not provide for such a remedy "would be a major addition to the statute," akin to an amendment.[49] The present approach has been labeled the "presumption against implied right of action" canon of interpretation.[50]

---

[45] *Alexander v Sandoval*, 532 US 275, 287; 121 S Ct 1511; 149 L Ed 2d 517 (2001), discussing *J I Case Co v Borak*, 377 US 426, 433; 84 S Ct 1555; 12 L Ed 2d 423 (1964); see also *Cort v Ash*, 422 US 66, 78; 95 S Ct 2080; 45 L Ed 2d (1975) (positing various factors in deciding whether to infer a cause of action, including whether the legislation sought to benefit or protect a discrete class and whether the private remedy furthers the statute's purposes).

[46] *Alexander*, 532 US at 287.

[47] See *id*. at 288 ("We therefore begin (and find that we can end) our search for Congress's intent with the text and structure of Title VI.").

[48] Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 316-317.

[49] *Id*.

[50] *Id*. at 313. See also *Callahan v Fed Bureau of Prisons*, 965 F3d 520, 523 (CA 6, 2020) ("What started out as a presumption in favor of implied rights of action has become a firm presumption against them.").

Our caselaw charts a similar course.[51]  At one time, we followed the Restatement view and inferred causes of action to further legislative purposes.[52]  But we have since adopted the view that implied causes of action must arise, if at all, from the statutory text itself and not from vague perceptions of legislative objectives.[53]  In a 2005 opinion, we noted that the United States Supreme Court had "become increasingly reluctant to imply a private cause of action" and had instead focused on the "central inquiry [of] whether Congress intended to create, either expressly or by implication, a private cause of action."[54]  And, in fact, we said that the United States Supreme Court had apparently moved to "a completely textual analysis in determining whether a private remedy exists under a particular statute."[55]  We likewise indicated that the criterion for implied causes of action was the statutory text.[56]

---

[51] See generally *Mays*, 506 Mich at 260 n 89 (VIVIANO, J., concurring in part and dissenting in part) (discussing the caselaw).

[52] See *Gardner v Wood*, 429 Mich 290, 301; 414 NW2d 706 (1987) ("Where a penal statute is silent concerning whether a violation of its provisions should give rise to a civil remedy, courts will infer a civil remedy for the violation 'to further the ultimate policy for the protection of individuals which they find underlying the statute, and which they believe the legislature must have had in mind.' "), quoting Prosser & Keeton, Torts (5th ed), § 36, p 222.

[53] See *Myers v Portage*, 304 Mich App 637, 643 n 12; 848 NW2d 200 (2014) (discussing this Court's changing caselaw).

[54] *Office Planning Group, Inc v Baraga-Houghton-Keweenaw Child Dev Bd*, 472 Mich 479, 497, 498; 697 NW2d 871 (2005) (quotation marks and citation omitted).

[55] *Id*. at 499.

[56] *Id*. at 500 (interpreting a federal statute); see also *Lash v Traverse City*, 479 Mich 180, 193; 735 NW2d 628 (2007) (noting that in a case involving the government as a defendant, we would not recognize a cause of action without express provision by the Legislature).

18

Nothing in the text of our state Constitution generally allows damages remedies for constitutional violations. Like the federal Constitution, our Constitution does not generally refer to remedies.[57] This distinguishes our Constitution from those that contain a remedies clause that expressly entitles individuals to a remedy for violations of those constitutions.[58] It is noteworthy that even with such a constitutional provision, at least one state has rejected inferring causes of action for damages.[59] Nothing in the text of the provision at issue here, the Due Process Clause, supports a damages remedy: "No person shall . . . be deprived of life, liberty or property, without due process of law."[60]

Plaintiffs and the majority try to invoke the 1961 constitutional convention records for support, but they point to nothing very useful. The closest they come is that the

---

[57] See Fallon, Jr. & Meltzer, *New Law, Non-Retroactivity, and Constitutional Remedies*, 104 Harv L Rev 1731, 1779 (1991) ("The Constitution generally makes no reference to remedies."); cf. Hill, *Constitutional Remedies*, 69 Colum L Rev 1109, 1132 (1969) ("It may fairly be assumed that the founding fathers did not contemplate a new species of constitutional tort."). Of course, there are some exceptions. For example, "[p]rivate property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2; see also US Const, Am V ("[N]or shall private property be taken for public use, without just compensation.").

[58] See, e.g., Minn Const, art 1, § 8 ("Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws."); see also Phillips, *The Constitutional Right to a Remedy*, 78 NYU L Rev 1309, 1310 (2003) (noting that the remedies clause "expressly or implicitly appears in forty state constitutions").

[59] See Tex Const, art 1, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."); *Bouillion*, 896 SW2d at 147 (declining to find an implied private right of action for damages under various provisions of the state constitution).

[60] Const 1963, art 1, § 17.

19

convention considered—but did not add—the line that "[t]his provision [i.e., the Declaration of Rights] shall not be construed to enable the denial to any citizen of any direct and immediate legal remedy in the courts of this state."[61] This is a far cry from the proposition that the *drafters intended* for damages remedies to be available, if such an argument from unstated intentions were even relevant. This language was eventually reflected in the section on the civil rights commission: "Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state."[62] Thus, to the extent the language even appears in the Constitution, it involves only a specific section not relevant here. If anything, to the extent that the language was considered but not placed in the Declaration of Rights, that would seem to weigh in favor of concluding that the convention rejected the notion that the Declaration would keep undiminished the ability of individuals to access the courts to obtain monetary damages for violations of their constitutional rights.[63]

Finally, it is not at all clear that the language is referring to money damages for constitutional violations. *Bivens* had not yet been decided at the time of the convention, and we had no history of providing damages for constitutional violations at that time. There is no reason to believe that the convention delegates and the ratifying public had the

---

[61] 2 Official Record, Constitutional Convention 1961, p 1946.

[62] Const 1963, art 5, § 29.

[63] Cf. *In re MCI Telecom Complaint*, 460 Mich 396, 415; 596 NW2d 164 (1999) ("Where the Legislature has considered certain language and rejected it in favor of other language, the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected.").

20

clairvoyance to anticipate the coming caselaw creating those damages remedies. And even if they had, they left no marks on the Constitution itself approving such remedies.[64]

The majority's textual analysis instead amounts to the proposition that the very nature of a right implies a remedy. This proposition does have some intuitive pull and a distinguished provenance. In *Marbury v Madison*, Chief Justice Marshall proclaimed that the "government of law, and not of men," will "cease . . . if the laws furnish no remedy for the violation of a vested legal right."[65] But it is equally clear that a government of laws requires that those remedies be established and enforced by the proper legal process. That is why, in *Marbury*, despite finding that William Marbury's rights had been violated, the Court left him without a remedy: Congress had not properly granted the Court jurisdiction to hear the case in the first place, and thus no remedy could be crafted or enforced for the violation of Marbury's rights.[66]

---

[64] Another textual argument some have made to support damages remedies is that such remedies flow from the fact that a constitutional provision is self-executing. See *Brown v New York*, 89 NY2d 172, 186; 674 NE2d 1129 (1996) ("A civil damage remedy cannot be implied for a violation of the State constitutional provision unless the provision is self-executing . . . ."); Bandes, *Reinventing* Bivens*: The Self-Executing Constitution*, 68 S Cal L Rev 289, 292 (1995) (arguing that *Bivens* could be justified by the self-executing nature of constitutional provisions). A self-executing provision is one that " 'supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced,' " *Detroit v Oakland Circuit Judge*, 237 Mich 446, 451-452; 212 NW 207 (1927) (citation omitted), such that "it takes effect immediately, without the necessity for supplementary or enabling legislation," *Brown*, 89 NY2d at 186. But as the Vermont Supreme Court has explained, "The fact that the constitutional provision is self-executing means only that the rights contained therein do not need further legislative action to become operative. It does not necessarily mean that monetary damages is the proper remedy for a violation." *Shields v Gerhart*, 163 Vt 219, 227-228; 658 A2d 924 (1995).

[65] *Marbury v Madison*, 5 US (1 Cranch) 137, 163; 2 L Ed 60 (1803).

[66] *Id*. at 180; see also *Nixon v Fitzgerald*, 457 US 731, 755 n 37; 102 S Ct 2690; 73 L Ed 2d 349 (1982) ("Yet *Marbury* does not establish that the individual's protection must come

21

The United States Supreme Court has elsewhere recognized that not all areas of law provide for damages remedies for rights violations: "Our implied-rights-of-action cases identify another area of the law in which there is not a damages remedy for every legal wrong."[67]

We, too, have explained that not all rights are vindicated in court:

> But it is said that this conclusion will leave parties who have rights, in many cases, without remedy. Practically, there are a great many such cases, but theoretically, there are none at all. All wrongs, certainly, are not redressed by the judicial department. A party may be deprived of a right by a wrong verdict, or an erroneous ruling of a judge, and though the error may be manifest to all others than those who are to decide upon his rights, he will be without redress. A person lawfully chosen to the legislature may have his seat given by the house to another, and be thus wronged without remedy. A just claim against the State may be rejected by the board of auditors, and neither the governor nor the courts can give relief. A convicted person may conclusively demonstrate his innocence to the governor, and still be denied a pardon. In which one of these cases could the denial of redress by the

---

in the form of a particular remedy. Marbury, it should be remembered, *lost* his case in the Supreme Court. The Court turned him away with the suggestion that he should have gone elsewhere with his claim."); *Colegrove v Green*, 328 US 549, 556; 66 S Ct 1198; 90 L Ed 1432 (1946) (opinion by Frankfurter, J.) ("The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial actions."); Fallon, Jr., *Bidding Farewell to Constitutional Torts*, 107 Calif L Rev 933, 970-971 (2019) ("Critics routinely pillory the Supreme Court's retreat from *Bivens* . . . as [a] betrayal[] of *Marbury*'s promise of an individually effective remedy for every violation of an individual right. But *Marbury*, as properly interpreted in the context of our tradition, made no such promise. The Supreme Court awarded no remedy to William Marbury. It is not clear that any other court would have done so either.") (citations omitted).

[67] *Nixon*, 457 US at 754 n 37; see also *Webster v Doe*, 486 US 592, 613; 108 S Ct 2047; 100 L Ed 2d 632 (1988) (Scalia, J., dissenting) ("[I]t is simply untenable that there must be a judicial remedy for every constitutional violation."); *New Law*, 104 Harv L Rev at 1786 ("But the existence of constitutional rights without individually effective remedies is a fact of our legal tradition, with which any theory having descriptive pretensions must come to terms.").

proper tribunal constitute any ground for interference by any other authority? The law must leave the final decision upon every claim and every controversy somewhere, and when that decision has been made, it must be accepted as correct.[68]

This also reflects the limited scope of the common-law principle, *ubi jus, ibi remedium*— " 'the principle that where one's right is invaded or destroyed, the law gives a remedy to protect it or damages for its loss.' "[69] One scholar has observed that, at the time of the country's founding and in the early nineteenth century (when Michigan was formed), this principle was more of a "platitude" than "black letter legal doctrine" because "a plaintiff had a cause of action at law or in equity only if judicial relief was available through a particular form of proceeding."[70] Writs available to plaintiffs were not invented to meet each new wrong.[71]

And historically—at least until the twentieth century—individuals generally looked to the legislative branch for protection and fulfillment of rights.[72] One court, for example, noted that the Second Amendment,

---

[68] *People ex rel Sutherland v Governor*, 29 Mich 320, 330-331 (1874).

[69] *People v Kabongo*, 507 Mich 78, 135; 968 NW2d 264 (2021) (opinion by ZAHRA, J.), quoting *Oxford Dictionary of Law* (8th ed).

[70] Bellia, Jr., *Article III and the Cause of Action*, 89 Iowa L Rev 777, 784 (2004).

[71] *Id*. at 786 ("Notwithstanding the oft-recited platitude *ubi jus, ibi remedium*, if no form of action afforded judicial relief, there was no remedy regardless of whether it could be said that there was a right.").

[72] See Dinan, *Keeping the People's Liberties: Legislators, Citizens, and Judges as Guardians of Rights* (University Press of Kansas, 1998), p xi (noting, in a study of Michigan and a handful of other states, that "[d]uring a republican regime, which had its origins in the initial state constitutions and predominated throughout the nineteenth century, rights were secured primarily through representative institutions and the political process, particularly through the passage of legislative statutes" and that "[n]ot until the middle of the twentieth century can we identify the emergence of a judicialist regime");

like similar provisions in our own Declaration of Rights, declares a great general right, leaving it for other more specific constitutional provision or to legislation to provide for the preservation and practical security of such right, and for influencing and governing the judgment and conscience of all legislators and magistrates, who are thus required to recognize and respect such rights.[73]

Consequently, I find nothing in the text of the Constitution that would remotely justify the creation of a cause of action for money damages in these circumstances.

## B. HISTORICAL PRACTICE

The majority also suggests that there is a historical practice of inferring causes of action in the Constitution and allowing damages remedies.[74] Some courts and scholars have pointed to 19th century caselaw and, even further back, to English common-law cases as support.[75] But these cases were run-of-the-mill tort actions in which the constitutional

---

Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill and London: The University of North Carolina Press, 1998), pp 301-302 ("Reform-minded Americans were thus committed to equity as a basis of law, but by resting their plans on legislative enactment they at the same time denied the judicial discretion that made equitable interpretations necessary and possible. . . . Not the courts but only the legislatures could redress the grievances of the people, said a New Jerseyite in 1781, 'because they are the representatives of the people.' . . . Legislatures should be the sole source of law."); but see Wood, *Power and Liberty: Constitutionalism in the American Revolution* (New York: Oxford University Press, 2021), ch 6 (noting the fear of judicial power but explaining that it began to be seen as a check upon the legislature in constitutional matters).

[73] *Opinion of Justices*, 80 Mass 614, 620 (1859).

[74] The text-and-history approach is increasingly used as the appropriate method for constitutional interpretation. See, e.g., *Dobbs v Jackson Women's Health Org*, 597 US ___, ___; ___ S Ct ___; ___ L Ed 2d ___ (2022); slip op at 9 (beginning with the constitutional text before turning to history and tradition); *New York State Rifle & Pistol Ass'n, Inc v Bruen*, 597 US ___, ___; ___ S Ct ___; ___ L Ed 2d ___ (2022); slip op at 10 (adopting "a test rooted in the Second Amendment's text, as informed by history").

[75] See generally *Widgeon v Eastern Shore Hosp Ctr*, 300 Md 520; 479 A2d 921 (1984) (discussing the early English cases); Woolhandler & Collins, *Was* Bivens *Necessary?*, 96 Notre Dame L Rev 1893, 1920 (2021) ("*Bivens* was supported by the Framers'

arguments were incidental to the cause of action and entitlement to damages.  These cases were common-law trespass actions in which the governmental defendant attempted to defend his or her actions by claiming that those actions were legally justified.  The constitutional issue would arise to "negate a defendant's plea of legal justification."[76]  In many cases, the governmental official would claim immunity for his or her action under federal law—the Constitution—but would lose that immunity if the official's action was unconstitutional.[77]

---

expectations that trespass actions against officials would be a means of implementing the Constitution."); Vladeck, *The Inconsistent Originalism of Judge-Made Remedies Against Federal Officers*, 96 Notre Dame L Rev 1869, 1871 (2021) (noting the " 'long history' of challenging completed unconstitutional conduct by federal officers, including the robust regime of judge-made damages actions that persisted well into the twentieth century in both state and federal courts") (citation and emphasis omitted); Vladeck, *The Disingenuous Demise and Death of* Bivens, 2019-2020 Cato Sup Ct Rev 263, 267-268 (2020) (noting the early United States Supreme Court caselaw); Baker, *The Minnesota Constitution as a Sword: The Evolving Private Cause of Action*, 20 Wm Mitchell L Rev 313, 322 (1994) ("Other states have grounded the right to sue for constitutional violations in the common law of England.").

[76] *Was* Bivens *Necessary?*, 96 Notre Dame L Rev at 1897; see also Amar, *Of Sovereignty and Federalism*, 96 Yale L J 1425, 1506-1507 (1987) ("The structure of these pre-*Bivens* cases was quite simple: The ultimate issue before the court concerned the federal Constitution, but standing was conferred by the vertically-pendent state law cause of action.  Plaintiff would sue defendant federal officer in trespass; defendant would claim federal empowerment that trumped the state law of trespass under the principles of the supremacy clause; and plaintiff, by way of reply, would play an even higher supremacy clause trump: Any federal empowerment was ultra vires and void because of Fourth Amendment limitations on federal power itself.  If, but only if, plaintiff could in fact prove that the Fourth Amendment had been violated, defendant's shield of federal power would dissolve, and he would stand as a naked tortfeasor.").

[77] See *Butz v Economou*, 438 US 478, 490-491; 98 S Ct 2894; 57 L Ed 2d 895 (1978) ("As these cases demonstrate, a federal official was protected for action tortious under state law only if his acts were authorized by controlling federal law.  'To make out his defence he must show that his authority was sufficient in law to protect him.' . . .  Since an unconstitutional act, even if authorized by statute, was viewed as not authorized in

Plaintiffs point to such a case from our Court, *Bishop v Vandercook*, as evidence that we have long recognized constitutional torts.[78] But *Bishop* was a traditional common-law action. In *Bishop*, the Governor had issued an order sending state troops to help crack down on bootleggers who were "lawless and viciously inclined drivers of automobiles[.]"[79] A few months later, with troops in place, the Governor authorized them to place a log across Dixie Highway to stop travelers.[80] He required that warnings be given and

contemplation of law, there could be no immunity defense."); Kian, *The Path of the Constitution: The Original System of Remedies, How it Changed, and How the Court Responded*, 87 NYU L Rev 132, 135 (2012) ("Those who suffered a violation of their rights were able to bring suit, in common law or equity, against the responsible agent. . . . [I]f that agent did something unconstitutional, he would have no legally cognizable defense for violating the plaintiff's rights."); *New Law*, 104 Harv L Rev at 1781 ("Sovereign immunity and related doctrines generally barred direct suits against the government. In many cases, a plaintiff denied relief from the sovereign could seek alternative redress from the official through whom the government had acted; a tradition arose under which an official who pleaded a defense of official authority would be 'stripped' of that shield when his conduct violated the Constitution, and hence held liable like a private tortfeasor."); *Constitutional Remedies*, 69 Colum L Rev at 1122-1123 ("In mitigation of the rigors of the doctrine of sovereign immunity, the view developed that the governmental officer acting under a void statute, or outside the bounds of a valid statute, may be regarded as stripped of his official character, and answerable, like any private citizen, for conduct which, when attributable to a private citizen, would be an offense against person or property.").

Some of the cases commonly cited by proponents of *Bivens*, such as *Little v Barreme*, 6 US (2 Cranch) 170; 2 L Ed 243 (1804), were trespass actions in which the defense did not implicate any constitutional issues. See generally *The Path of the Constitution*, 87 NYU L Rev at 147 (noting that *Little* did not involve constitutional rights but simply "affirmed a dynamic" that the "government could not exercise power not delegated to it"). It is difficult to see how such a case could stand for the proposition that the founders expected that damages remedies would be available through tort actions when a federal officer violated the Constitution.

[78] *Bishop v Vandercook*, 228 Mich 299; 200 NW 278 (1924).

[79] *Id*. at 303 (quotation marks omitted).

[80] *Id*.

precautions be taken to allow " 'good citizens' " to get through.[81]  The plaintiff was driving down the road at 50 to 60 mph.  The troopers used flashlights to signal for him to stop.  When he did not, they "fired a signal."  Other troopers placed the log across the highway and then used flashlights and red lanterns to signal the driver to stop, but without success.  The plaintiff crashed into the log, and liquor was subsequently found in his car.[82]

The plaintiff brought a *tort* action to recover damages for harm to the car and personal injuries and won a money verdict.[83]  The claim was that the defendants' actions "constituted a purposeful and wilful trespass."[84]  Thus, from the start, *Bishop* is not the same as *Smith*: *Bishop* was never an action under the Constitution.  In fact, the Constitution barely factors into the case aside from the stray line of dicta that plaintiffs have seized upon.  Instead, the issue was whether the defendants could claim immunity because they were acting under direction of the Governor.[85]  Specifically, they cited a statute that allowed troops to be dispatched to aid civil authorities—the command officer was to "be subject to the general direction of the sheriff or other civil officer who shall require his aid."[86]  While serving, "troops shall always be amenable to the civil authorities as represented by the governor, and shall be privileged from prosecution by the civil

---

[81] *Id*.

[82] *Id*. at 304.

[83] *Id*. at 305.

[84] *Id*.

[85] *Id*.

[86] *Id*. at 305, quoting 1917 PA 53, § 41 (quotation marks omitted).

authorities, except by direct order of the governor, for any acts or offenses alleged to have been committed while on such service."[87]

The sum of the Court's holding was the rejection of the defendants' "contention that the State troops in time of peace, and in actual service in aid of civil authority, are privileged from civil accountability for wrongs committed, except by direct order of the governor."[88] We read the statute as simply "stay[ing] interference by the civil authorities, but . . . not clos[ing] the courts to persons wronged by military lawlessness."[89] In our analysis, we stated that "[n]o legislative enactment can confer power upon the chief executive of the State to render the military immune from civil responsibility for wrongs done to citizens in time of peace, or grant to the military security beyond that accorded the civil officers in whose aid they act."[90]

The Court also mentioned that the Constitution subordinated the military to civilian authority and could be used only to aid that authority.[91] The Court then made the statement used by plaintiffs here:

> The emphatic provision of the Constitution (Art. 2, § 6) of the State, that: "the military shall in all cases and at all times be in strict subordination to the civil power," is not an empty phrase, but the wisdom of the ages expressed in a succinct mandate. Any transgression of this fundamental law by military officers renders them liable to respond in damages for injury done

---

[87] *Vandercook*, 228 Mich at 305-306, quoting 1917 PA 53, § 41 (quotation marks omitted).

[88] *Vandercook*, 228 Mich at 306.

[89] *Id*.

[90] *Id*. at 308.

[91] *Id*. at 309-310.

no matter how high the command to so act can be traced.  *Mitchell v. Harmony*, 13 How. (U. S.) 115; *Bates v. Clark*, 95 U. S. 204.[92]

Immediately following this statement, the Court concluded that the acts at issue were not authorized by the Governor.[93]  The Court made clear the holding was simply that the defendants could be liable under tort law.[94]

*Bishop* therefore does not stand for the proposition that monetary damages can be claimed in actions arising under the Constitution.  In proper context, the line plaintiffs rely on merely meant that the military officers could be liable for damages in a common-law tort action if their actions exceeded civil authority.  The source of the liability did not flow from the Constitution—it does not arise from the provision subordinating the military.  Rather, the military officers could be liable based on tort law, just like anyone else.  The only difference was the potential defense that military members might raise of following orders.

This conclusion is further confirmed by the sources *Bishop* cited: *Mitchell v Harmony*[95] and *Bates v Clark*.[96]  Both cases concerned actions for "trespass."  In the former, a merchant trailing United States troops during the Mexican-American War was ordered to remain with the troops—his request to depart from the army was denied.[97]

---

[92] *Id*. at 310.

[93] *Id*.

[94] *Id*. at 314-315.

[95] *Mitchell v Harmony*, 54 US (13 How) 115; 14 L Ed 75 (1851).

[96] *Bates v Clark*, 95 US 204; 24 L Ed 471 (1877).

[97] *Mitchell*, 54 US at 129.

29

Subsequently, the plaintiff's items were captured by the Mexican army and he sued the federal army officer who had earlier detained him.[98]  The Court held that the officer could be liable.[99]  In *Bates*, the plaintiff's whiskey was confiscated by military officers and the Court held that the "officers can no more protect themselves than civilians in time of peace by orders emanating from a source which is itself without authority."[100]  A statute allowed military officers to seize liquor in Indian country, but the plaintiffs were not in Indian country when their liquor was seized.  The Court observed that the officers' good-faith belief that the plaintiffs were in Indian country might excuse them from punitive damages but that it would not preclude the action itself.[101]  In citing these cases, *Bishop* was not establishing a rule allowing damages for violations of the Constitution—neither case involved the Constitution at all.  And not surprisingly, *Bishop* itself has, as far as I can tell, never been cited for that proposition either.

The earlier English common-law cases are even further from the mark.  In *Wilkes v Wood*, for example, the plaintiff sued for trespass when a government officer entered the plaintiff's house, broke his locks, and seized his papers.[102]  As the court said, the "present cause chiefly turned upon the general question, whether a Secretary of State has a power to force persons houses, break open their locks, seize their papers, &c. upon a bare

---

[98] *Id*. at 129-130.

[99] *Id*. at 135.

[100] *Bates*, 95 US at 209.

[101] *Id*.

[102] *Wilkes v Wood*, 98 Eng Rep 489, 489 (King's Bench, 1763).

suspicion of a libel by a general warrant, without name of the person charged."[103] Under

neither the English constitution nor statutory law was there "legal authority . . . to justify

the action."[104] Although the court emphasized the dangers of allowing the government to

have such authority, it is clear that the case was a typical trespass action that the plaintiff

could have brought against any private individual—the only difference being that the

defendant could defend based on alleged legal authority for his actions.[105] And, of course,

another critical distinction between these cases and *Bivens* and *Smith* is that they were

decided under the unwritten and amorphous British constitution.[106] The significance of the

written constitution, created in our states and then the national government, represented

something profoundly new, the significance of which had to be worked out over time.[107]

---

[103] *Id*. at 490.

[104] *Id*.

[105] See also *Huckle v Money*, 95 Eng Rep 768, 768-769 (King's Bench, 1763) (representing essentially the same situation); *Widgeon*, 300 Md at 527 ("Again, in *Entick v. Carrington*, 19 How. St. Tr. 1029 (1765), the plaintiff brought *a trespass action* against the King's messengers for unjustifiably entering his house and seizing his books and papers, and the jury awarded damages to the plaintiff. Lord Camden, after a lengthy historical review, upheld the damage award on the ground that the warrant to seize the papers was 'illegal and void . . . .' ") (emphasis added).

[106] Norton, *Governing Britain: Parliament, Ministers and Our Ambiguous Constitution* (Manchester: Manchester University Press, 2020), pp 7, 10-11 (noting that the British constitution's "history and form give rise to ambiguities and uncertainties" and that the British constitution can refer to "a body of laws (statutes and common law), conventions and practices that have developed over time").

[107] See Wood, *Power and Liberty: Constitutionalism in the American Revolution* (New York: Oxford Univ Press, 2021), pp 49-50 ("Although Americans were convinced that constitutions were decidedly different from legislation, the distinction was not easy to maintain. They hadn't yet imagined what a constitution meant."); Gienapp, *The Second Creation: Fixing the American Constitution in the Founding Era* (Cambridge: Belknap Press of Harvard University Press, 2018), pp 3, 5 ("When the Constitution was born, it was

It has been recognized, therefore, that these types of cases do not stand for the proposition that courts have historically implied causes of action in the constitutional text. The cause of action in these cases arose from the common law.[108] And those actions were never understood to be coterminous with constitutional provisions, i.e., a common-law action might or might not adequately redress a constitutional violation.[109] In addition, the framers of the state and federal Constitutions would have also recognized that the legislature could repeal the common law.[110] Consequently, it is hard to see how their mere

---

unclear what kind of thing it was. . . . When it first appeared, the new Constitution was a completely unprecedented kind of object; as a result, describing and interpreting it was an entirely novel exercise.") (paragraph structure omitted).

[108] The Supreme Court of Texas reached a similar conclusion with regard to caselaw in that state, which had previously recognized a false-imprisonment claim for monetary damages against a government officer. *Bouillion*, 896 SW2d at 150, discussing *Gold v Campbell*, 54 Tex Civ App 269; 117 SW 463 (1909). "However," the court stated, "the cause of action alleged in *Gold* was the traditional common law tort of false imprisonment, not a tort for the violation of constitutional rights. *Gold* did not create a new cause of action; rather, it recognized that an officer who acts outside the scope of his authority is amenable to suit under a traditional common law cause of action." *Id*. Therefore, the court "disapprove[d] of any interpretation of *Gold* that concludes it authorized a constitutional tort cause of action." *Id*.

[109] See *Constitutional Remedies*, 69 Colum L Rev at 1121 (1969) ("Some conduct violative of the Constitution is not of a kind that would be actionable at common law.").

[110] See Const 1963, art 3, § 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."); Nelson, *Americanization of the Common Law: The Impact of Legal Change on Massachusetts Society, 1760-1830* (Athens: University of Georgia Press, 1994), p 90 (noting the development of written constitutions in this period and stating "the power to modify or even entirely repeal the common law[] now fell explicitly within the jurisdiction of the legislature"); see generally Redish, *Constitutional Remedies as Constitutional Law*, 62 BC L Rev 1865, 1868 (2021) ("Many have concluded that constitutional remedies present a sub-constitutional issue, and are therefore fully within the power of Congress to regulate as it sees fit.").

expectation of the availability of such common-law actions could be interpreted as a constitutional requirement that such actions exist.[111] Even so, the expected applications of constitutional text, not reflected in the text itself, are usually entitled to little or no interpretive weight.[112]

---

[111] Some have nonetheless made that argument. See Vázquez, Bivens *and the* Ancien Regime, 96 Notre Dame L Rev 1923, 1929 (2020) ("This history is not relevant because it supports an analogous federal judicial power to *create* damage remedies in a common-law fashion. Rather, this history is important because it reflects the understanding when the Constitution was ratified, and subsisting long thereafter, that damages were an appropriate remedy for constitutional violations by federal (and state) officials."); *The Path of the Constitution*, 87 NYU L Rev at 134 (noting the original expectation that "the Constitution was to be implemented through remedies available for violations of common law rights").

[112] See McGinnis & Rappaport, *Original Interpretive Principles as the Core of Originalism*, 24 Const Comment 371, 378 (2008) (noting that while expected applications can provide some evidence of original meaning, "[t]he original meaning of the words would not normally be defined by the expected applications, but instead by the meaning that people at the time would understand the words to have"). In this regard it is noteworthy, as some have argued, that these expectations might have been stymied over time as common-law actions against governmental officers became increasingly more difficult because of trends such as officer immunity and practical challenges such as parsimonious views of damages. *The Path of the Constitution*, 87 NYU L Rev at 149-161. But even to the extent the framers conceived of common-law remedies as a manner for vindicating constitutional rights, these changes were baked into the system because the common law has always been subject to change. Certainly, constriction of common-law actions against officers does not justify the judicial creation of constitutional-damages actions simply so that the prospects facing plaintiffs today approximate those plaintiffs experienced at the founding. Such an ends-driven approach is anathema to the rule of law. 1 Story, Commentaries on the Constitution of the United States (4th ed), §§ 425, 426, pp 313, 314 ("A power, given in general terms, is not to be restricted to particular cases merely because it may be susceptible of abuse, and if abused may lead to mischievous consequences. . . . [A] rule of equal importance is not to enlarge the construction of a given power beyond the fair scope of its terms merely because the restriction is inconvenient, impolitic, or even mischievous.") (paragraph structure omitted).

## C. CONCLUSION

For these reasons, nothing in the text or history of our Constitution supports finding a general cause of action for damages based on constitutional violations or a specific cause of action for such damages regarding the provision at issue here, the Due Process Clause. Consequently, in allowing such claims, I believe that *Smith* was wrongly decided and that the majority compounds this error today by broadening *Smith*.

Seeking to avoid this conclusion, the majority notes that lawsuits can be filed to enjoin violations of the Constitution—I agree—and thus the majority contends that my complaint is not with implying a cause of action but with the relief being granted, i.e., money damages.[113] This Court has already addressed the substance of this argument:

> There is obviously a distinction between a judicial decree *invalidating* unconstitutional governmental action and the adoption of judicially created doctrines that effectively serve as de facto statutory enactments to implement Const 1963, art 1, § 2. The former is classic judicial review recognized as a core judicial function since, at least, the decision in *Marbury v Madison*, 5 US (1 Cranch) 137; 2 L Ed 60 (1803). The latter is an improper usurpation of legislative authority. To fail to heed this limitation on judicial power would be to fail "to maintain the separation between the Judiciary and the other branches." [*Lewis*, 464 Mich at 788-789 (citation omitted).]

A suit for an injunction seeks to prevent or end a constitutional violation; a cause of action for money damages seeks to remedy past constitutional violations. The former have been available from the start of constitutional litigation, whereas the latter are a creature of the twentieth-century judiciary.

---

[113] In this regard, even, my position is essentially the same one staked out by the United States Supreme Court, which allows enforcement of the Constitution through suits for injunctions but has severely constricted the availability of implied causes of actions for damages. See, e.g., *Ziglar*, 582 US at ___; 137 S Ct at 1862 (noting the availability of injunctive relief for constitutional violations).

Critically, the injunctive remedy arises from an equitable action seeking to invoke a court's equitable powers rather than from a legal cause of action grounded in the constitutional text.[114]  As the Supreme Court has noted, "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."[115]  For that reason, the Court held that a suit for an injunctive remedy to enforce a constitutional provision—the Supremacy Clause in that case—did not "rest[] upon an implied right of action contained in the" constitutional text.[116]  Accordingly, recognition of the ability to invoke a court's equitable powers to prevent or restrain constitutional violations is not inconsistent with a rejection of inferring causes of action for damages from the constitutional text.

## III.  STARE DECISIS

Given this analysis, I believe not only that the majority's expansion of *Smith* is wrong but also that *Smith* itself should be overruled.  In addition to concluding a precedent was wrongly decided—which I have established above with regard to *Smith*—we must

---

[114] See 13A Wright & Miller, Federal Practice and Procedure (Apr 2022 update), § 3531.6 ("Rather than infer a cause of action directly from a constitutional provision, courts may resort to finding a cause of action in equity for injunctive relief . . . .").

[115] *Armstrong v Exceptional Child Ctr, Inc*, 575 US 320, 327; 135 S Ct 1378; 191 L Ed 2d 471 (2015).

[116] *Id*.; see also *Fed Defenders of NY, Inc v Fed Bureau of Prisons*, 954 F3d 118, 133-134 (CA 2, 2020) (noting, in the context of Sixth Amendment claims, the "narrow but well-drawn line of precedent establishing that a plaintiff may invoke the court's equitable powers to enjoining a defendant from violating constitutional provisions that do not, themselves, grant any legal rights to private plaintiffs").

examine three other factors before overruling it: (1) whether the rule has proved not to be practically workable, (2) whether reliance interests in the rule would lead to hardships if the rule were overruled, and (3) "whether changes in the law or facts no longer justify the questioned decision."[117]

With regard to the first factor, *Smith* defies practicable workability. Critically, until the majority's thunderbolt today, a majority of the Court has never even agreed on a test for discerning when causes of action can be inferred. And although the Court of Appeals, and a plurality of this Court in *Mays*, may have applied Justice BOYLE's multifactor approach, that approach is awash in policy considerations that leave parties and courts no clear guidance on whether a cause of action will be inferred in any given case. Most clearly, the open-ended final factor—allowing consideration of "various other factors"—gives courts permission to consider anything they would like to create a cause of action.[118]

With regard to the second factor, any reliance interests must be greatly diminished by the fact that a majority of this Court has never inferred a cause of action for money damages under *Smith*—not even in *Smith* itself. As the United States Supreme Court recently explained in the criminal law context, "Continuing to articulate a theoretical exception that never actually applies in practice offers false hope to defendants, distorts the law, misleads judges, and wastes the resources of defense counsel, prosecutors, and courts. Moreover, no one can reasonably rely on an exception that is non-existent in practice, so

---

[117] *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 584; 702 NW2d 539 (2005).

[118] *Smith*, 428 Mich at 648-652 (BOYLE, J., concurring in part and dissenting in part).

no reliance interests can be affected by forthrightly acknowledging reality."[119] In addition, the general rule of allowing monetary damages is diffuse enough—in that it applies to all relevant constitutional rights—that it is difficult to see what institutions have formed or behavior has changed in reliance upon it. That is, the possibility of obtaining damages for constitutional violations does not seem to have led individuals to enter into relationships or associations or engage in any activities that would be disrupted by overruling *Smith*.

Finally, the third factor also weighs in favor of overruling *Smith*. As discussed, there was no precedent from this state supporting *Smith*. To the extent it could claim any supporting authority, that authority—*Bivens*—has since been severely undercut. A damages claim will not be inferred in federal court if "there is *any* reason to think that Congress *might* be better equipped to create a damages remedy."[120] Courts will rarely, if ever, be better placed than a legislature to create damages remedies.[121]

Accordingly, I would overrule *Smith* and put an end to our usurpation of the Legislature's authority to create causes of action for damages for constitutional violations.

### IV. APPLICATION OF *SMITH*

As a last consideration, it is worth addressing how this case would have been resolved if the majority had simply applied Justice BOYLE's test. Just two terms ago, three

---

[119] *Edwards v Vannoy*, 593 US ___, ___; 141 S Ct 1547, 1560; 209 L Ed 2d 651 (2021).

[120] *Egbert*, 596 US at ___ (opinion of the Court); slip op at 7 (emphasis added).

[121] *Id*. at ___ (Gorsuch, J., concurring); slip op at 2 ("When might a court *ever* be 'better equipped' than the people's elected representatives to weigh the 'costs and benefits' of creating a cause of action? It seems to me that to ask the question is to answer it.") (paragraph structure omitted).

justices in the current majority noted that this test was "persuasive."[122]   The majority opinion in this case provides nothing of substance to explain why the test has somehow become less persuasive.  The majority nonetheless casts it aside, perhaps because applying it here would not yield a cause of action.

The first question under the test is whether a custom or policy caused the constitutional violation.[123]  Defendant, the Unemployment Insurance Agency, argues there was no custom or policy because nothing required it to intercept tax refunds or garnish wages—it simply employed software that identified potential fraud.  I will assume for present purposes that this requirement is satisfied because, even if it was, the agency would still prevail on the other factors.  First, I will address "the degree of specificity of the constitutional protection[.]"[124]  While the Due Process Clause, as interpreted by the courts, covers a broad swath of territory, the general procedural components of the clause are clear.[125]  But how those requirements apply in any given case is a different matter.  As the Court of Appeals recognized in the present case, "due process is flexible and the procedural protections that it offers may vary depending on the circumstances . . . ."[126]  Indeed, Justice BOYLE herself indicated that the Due Process Clause does not offer sufficiently clear

---

[122] *Mays*, 506 Mich at 188 (plurality opinion by BERNSTEIN, J.).

[123] *Smith*, 428 Mich at 642-643 (BOYLE, J., concurring in part and dissenting in part).

[124] *Mays*, 506 Mich at 196 (plurality opinion by BERNSTEIN, J.).

[125] Orth, *Due Process of Law: A Brief History* (Lawrence: University Press of Kansas, 2003), p 88 (noting that the United States Supreme Court had "spelled out exactly what [due process's hearing requirement] means").

[126] *Bauserman v Unemployment Ins Agency (On Remand)*, 330 Mich App 545, 569; 950 NW2d 446 (2019).

protection.[127]  Thus, the clarity of the constitutional provision does not support a damages remedy.

I do not find the "existence and clarity of the constitutional violation itself" to be sufficient to support plaintiffs' argument in this case.[128]  Plaintiffs received notices in the form of letters, which detailed how to appeal; both plaintiffs here had the opportunity to and did, in fact, file an appeal.  Plaintiffs' amended complaint stated that the lack of due process was in the use of the automated decision-making system because it determined guilt without meaningful notice or opportunity to be heard before imposition of the penalties.  If the penalties were truly imposed before notice and a hearing, then this might state a due-process claim.  But it is not clear that this is the case here.  In general, the automated system makes the initial determination, but the amended complaint acknowledged that notice was sent.  The problem, according to the amended complaint, was that the notice was practically useless because it was sent through the online unemployment system, which former recipients of unemployment benefits were unlikely to check.  As the agency's brief notes, however, plaintiffs here elected to receive notices through the online account.  The amended complaint also states that plaintiffs wrote to defendant and submitted online appeals, although they never received a response.  Of course, if it is true that they never received a response, then perhaps there was a due-process

---

[127] See *Smith*, 428 Mich at 651 (BOYLE, J., concurring in part dissenting in part) ("These search and seizure protections are, however, relatively clear-cut in comparison to the Due Process and Equal Protection Clauses.").

[128] *Mays*, 506 Mich at 196 (plurality opinion by BERNSTEIN, J.).

violation. But plaintiffs received numerous notices and had a number of opportunities to object to the agency's action.

The next factor is the "support for the propriety of a judicially inferred damages remedy in any text, history, and previous interpretations of the specific provision[.]"[129] As discussed above, nothing in the text or history of the Due Process Clause supports a damages remedy. With regard to precedent, we have never inferred damages remedies for procedural due-process violations. And the United States Supreme Court likewise has never "extended a <u>Bivens</u> remedy to an alleged substantive or procedural due process violation of the Fifth Amendment by a federal official."[130]

The next consideration is "the availability of another remedy[.]"[131] In this regard, the United States Supreme Court's decision in *Schweiker v Chilicky* is instructive.[132] In that case, the Court rejected a *Bivens* claim involving the federal Due Process Clause.[133] The plaintiffs were individuals whose Social Security disability benefits were terminated—most of the plaintiffs appealed and were restored benefits with full retroactivity, while the remaining plaintiff filed a new application, was granted benefits, and received almost all the unpaid benefits for the period he had been denied benefits.[134] As here, the plaintiffs'

---

[129] *Id.*

[130] *Doe v United States*, 381 F Supp 3d 573, 612 (MD NC, 2019).

[131] *Mays*, 506 Mich at 196 (plurality opinion by BERNSTEIN, J).

[132] *Schweiker v Chilicky*, 487 US 412; 108 S Ct 2460; 101 L Ed 2d 370 (1988).

[133] *Id.* at 414.

[134] *Id.* at 417.

due-process claims centered on the allegedly unconstitutional procedures by which the agencies wrongfully terminated their benefits.[135] In rejecting the claim, the Court noted the comprehensive review procedures available to the plaintiffs through the relevant legislation. The process enabled claimants to appeal wrongful terminations with new evidence and arguments along the way, ending in judicial review (which could include review of constitutional claims).[136]

The point of contention in *Schweiker* was that the review process enacted by Congress did not provide for money damages when unconstitutional conduct led to the wrongful denial of benefits.[137] Looking to its caselaw, the Court explained that Congress's failure to provide for " 'complete relief' " was not a reason to infer a damages remedy.[138] The bare fact that some injuries would go unredressed was not determinative because Congress had created an elaborate system. "[T]he presence of alleged unconstitutional conduct that is not *separately* remedied under the statutory scheme" did not "imply that the statute has provided 'no remedy' for the constitutional wrong at issue."[139] Imposing personal liability for acts within that system would no doubt disrupt Congress's balancing

---

[135] *Id*. at 418.

[136] *Id*. at 424.

[137] *Id*.

[138] *Id*. at 425, quoting *Bush v Lucas*, 462 US 367, 388; 103 S Ct 2404; 76 L Ed 2d 648 (1983) (noting that the question of whether to infer a remedy "obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff").

[139] *Schweiker*, 487 US at 427-428.

41

of interests.[140]  Moreover, the harm for which the plaintiffs sought damages—"consequential damages for hardships resulting from an allegedly unconstitutional denial of a statutory right"—could not "be separated from the harm resulting from the denial of the statutory right."[141]  Summing up, the Court stated:

> We agree that suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the "belated restoration of back benefits."  The trauma to respondents, and thousands of others like them, must surely have gone beyond what anyone of normal sensibilities would wish to see imposed on innocent disabled citizens.  Nor would we care to "trivialize" the nature of the wrongs alleged in this case.  Congress, however, has addressed the problems created by state agencies' wrongful termination of disability benefits.  Whether or not we believe that its response was the best response, Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program. . . . Congress has discharged that responsibility to the extent that it affects the case before us, and we see no legal basis that would allow us to revise its decision.[142]

The Court of Appeals in the present case distinguished *Schweiker* on the unpersuasive ground that it "did not involve highly egregious facts such as those alleged in the instant case."[143]  In particular, the Court of Appeals noted that the plaintiffs in *Schweiker* were simply denied benefits whereas plaintiffs here had their own property taken.  This distinction, even if true, is irrelevant.  The egregiousness of the conduct is not a factor that this Court or the United States Supreme Court has ever considered or endorsed.

---

[140] *Id*. at 425.

[141] *Id*. at 428.

[142] *Id*. at 428-429.

[143] *Bauserman (On Remand)*, 330 Mich App at 575.

Moreover, it is unclear whether the Court of Appeals was correct: are disability claimants who depended on government benefits to survive in a better position to weather the termination of those benefits than the plaintiffs here are in to withstand garnishments and collection actions? It is certainly possible that the disabled plaintiffs in *Schweiker* were even more deeply affected by the wrongful denial of benefits than plaintiffs in this case.

As in *Schweiker*, the procedures available to plaintiffs in the present case were extensive. Unemployment claimants can protest any determination made with regard to recoupment of overpayments.[144] If a protest is made—or the claimant asks for a hearing before an administrative law judge—the agency will review its decision and can affirm, modify, or reverse it, or send the protest for an administrative hearing.[145] "The Agency can also review a prior determination *in the absence of a protest* so long as it does so within" a certain period.[146] Even if the protest is not filed within the required period, the agency can still review the earlier determination.[147] "A claimant or employer who disagrees with a redetermination [by the agency] can appeal the decision to an administrative law judge . . . ."[148] That judge "shall decide the rights of the interested parties" and render a decision with findings of fact and supporting rationales.[149] After this

---

[144] *Dep't of Licensing & Regulatory Affairs/Unemployment Ins Agency v Lucente*, 508 Mich 209, 223-225; 973 NW2d 90 (2021), discussing MCL 421.32a(1).

[145] MCL 421.32a(1).

[146] *Lucente*, 508 Mich at 224-225.

[147] See *id.*, discussing MCL 421.32a.

[148] *Lucente*, 508 Mich at 225, citing MCL 421.32a(1) and (3).

[149] MCL 421.33(1).

decision, claimants have yet another opportunity to prevail within the agency by appealing to the Michigan Compensation Appellate Commission.[150] From there, the claimant can appeal in the circuit court and can seek further appellate review of any decision rendered by the court.[151]

This elaborate scheme provides ample opportunities for the agency to correct any mistakes internally before judicial review is invoked. It is at least as extensive as the Social Security disability review process discussed in *Schweiker*. Indeed, the agency here used this redetermination process to undo its erroneous decisions within just a few months of plaintiffs' challenges.[152] The Court of Appeals here required far more than the United States Supreme Court ever has when deciding that the statutory framework in this case failed to provide a suitable alternative remedy because it did not allow for monetary damages or a way to raise constitutional due-process challenges. Under *Schweiker* and the caselaw discussed there, it does not matter if the alternative remedy is incomplete and fails to provide monetary damages. Moreover, the agency judges handling Social Security disability reviews also lack the power to adjudicate constitutional challenges.[153] For these reasons, I believe that the alternative remedies here were adequate.

---

[150] *Lucente*, 508 Mich at 225-226, citing MCL 421.34.

[151] MCL 421.38.

[152] *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 175-176; 931 NW2d 539 (2019).

[153] See *Carr v Saul*, 593 US ___, ___; 141 S Ct 1352, 1361-1362; 209 L Ed 2d 376 (2021) (noting and agreeing with internal Social Security guidance explaining that administrative law judges (ALJs) lacked the power to rule on a constitutional challenge); *Culclasure v Comm'r of Social Security Admin*, 375 F Supp 3d 559, 569 (ED Penn, 2019) (noting that ALJs were powerless to decide the constitutional question raised in the case).

With regard to Justice BOYLE's last factor, I see no other "factors" relevant to this case that would justify a damages remedy. I therefore believe that a damages remedy cannot properly be inferred under this test. Perhaps this clear result explains why the majority adopts a brand new test under which money damages will almost always be available.

## V. CONCLUSION

The Court's holding today lacks any basis in our common-law powers or the constitutional text. It represents a gross overreach given that the judicial branch has now seized legislative power to fashion remedies for all manner of constitutional violations. The Constitution, our foundational document and source of law, has been transformed into a wellspring of potential new claims against the state and its political subdivisions. And under today's ruling, the Legislature is largely powerless to act: it can create remedies for constitutional violations but unless we bless them as "adequate"—whatever that means to the members of the Court serving at that time—we will superimpose our own preferred remedies. A deluge of cases and a swelling of taxpayer liability will surely ensue. I dissent.

David F. Viviano
Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

GRANT BAUSERMAN, KARL
WILLIAMS, and TEDDY BROE, on Behalf
of Themselves and All Others Similarly
Situated,

        Plaintiffs-Appellees,

v                             No. 160813

UNEMPLOYMENT INSURANCE
AGENCY,

        Defendant-Appellant.

_____

CLEMENT, J. (*dissenting*).

      Because plaintiffs do not ask us to reconsider the test Justice BOYLE set out in her

partial concurrence in *Smith v Dep't of Pub Health*, 428 Mich 540; 410 NW2d 749 (1987),

and replace it with a more lenient test, I would simply apply that test to their claims.  For

the reasons stated in Part IV of Justice VIVIANO's dissent, under that test, I do not believe

that we should infer a damages remedy in the instant case.  Therefore, I dissent.

                                    Elizabeth T. Clement